## In re SUMMERHAYES.

(District Court, N. D. California. November 8, 1895.)

### No. 11,205.

GRAND JURORS—DISCLOSING PROCEEDINGS—CONTEMPT.

A federal grand jury, when impaneled, was properly instructed by the court in respect to the duty of its members to keep their deliberations secret, and to abstain from all conversation in regard thereto outside the jury room. Subsequently, one F., who had caused an alleged crime, relating to matters in which he was interested, to be investigated by the grand jury, presented to the court an affidavit in which he alleged that one of the grand jurors had accosted him and his counsel in an hotel, requesting an interview, and had there conversed with them for some hours about the matters before the grand jury in which F. was interested, telling them many things which had occurred in the grand jury room and suggesting that, for money, F. might secure the indictment of the persons whom he wished to have indicted. Upon investigation of the charge in court, the juror denied that he had suggested bribery, but substantially admitted the other allegations, claiming that he had only inadvertently violated his duty. *Held* that, upon the juror's own admission, disregarding the charge of soliciting a bribe which, as it involved a crime, should not be passed upon in contempt proceedings, it appeared that the juror had been guilty of a contempt of court, involving a serious wrong, which could not, consistently with the circumstances, have been inadvertent, and he should be punished by imprisonment for six months.

In re order to show cause why H. J. Summerhayes, a member of the grand jury of the district court of the United States for the Northern District of California for the July, 1895, term, should not be punished for contempt of court in disobeying an instruction of said court.

H. S. Foote, U. S. Dist. Atty., and Bert Schlesinger, Asst. U. S. Dist. Atty.

Robert Ferral, for H. J. Summerhayes.

MORROW, District Judge (orally). The grand jury of this court was impaneled on the 1st day of August of the present July term. The respondent was drawn as a member of that body. He was impaneled, after being examined as to his qualifications, to serve as a juror, and was thereupon sworn in this court by the clerk; the clerk first administering the oath to the foreman of the jury in this form:

"You, Philo D. Jewett, as foreman of this grand inquest for the body of the Northern district of California, do solemnly swear that you will diligently inquire and true presentment make of all such matters and things as shall be given you in charge. The counsel of yourself and your fellows you shall

keep secret. You shall present no person from envy, hatred, or malice. Neither shall you leave any person unpresented from fear, favor, affection, gain, reward, or the hope thereof. But you shall present all things truly as they come to your knowledge, according to the best of your understanding. So help you God."

This same oath, taken by the foreman of the grand jury, was administered by the clerk to all the other members of the body. After the oath had been administered to the grand jury, the court proceeded to instruct the members as to their duty, and, among other things, instructed the jury, particularly:

"That you must keep your deliberations secret. You are not at liberty even to state that you have a matter under consideration. You will allow no one to question you as to your action or the action of your associates on the grand jury."

In other words, the instructions of the court were, specifically, that the lips of the jurors were absolutely sealed respecting every matter that might come before the body in the course of its proceedings. It is not for a juror to disclose any secrets of the body of which he is a member, or reveal anything concerning any matter brought before the jury, nor is it the province of the juror to privately interview witnesses, or to approach witnesses who have been before the jury, concerning their testimony, outside of the jury room. The instructions, in this respect, were full and specific.

On the 7th of this month the following affidavit was presented to this court:

"Northern District of California, City and County of San Francisco, State of California—ss.:

"Walter K. Freeman, being first duly sworn, deposes and says: That he is one of the parties to an interference proceeding now pending in the United States patent office, wherein the Westinghouse Electric Company, Gibbs, et al., are also contesting parties. That, pursuant to notice served on the part of said Westinghouse Electric Company, Gibbs, et al., he came to San Francisco on or about the 23d day of October, A. D. 1895, with his counsel, J. B. Church, Esq., of Washington, D. C., in order to attend the examination of witnesses produced on behalf of said Westinghouse Electric Company, Gibbs, et al. That, upon his arrival in San Francisco, he learned certain facts which led him to believe that a conspiracy had been formed to suborn witnesses to give perjured testimony, and in furtherance of that conspiracy that threats and intimidation had been used in the case of certain witnesses which it was proposed to examine in said proceeding. That, upon ascertaining these facts, and within twenty-four hours after his arrival, he laid the matter as then known to him before the United States district attorney, and requested that the same be investigated. That subsequent developments confirmed his suspicions, and the matter was again brought to the attention of the United States district attorney's office, whereupon the parties concerned were subpœnaed before the United States grand jury, to the end that the whole matter might be fully and fairly investigated. I was subpœnaed to appear before the grand jury at 2 o'clock p. m. on Tuesday, the 5th inst. I am informed that other witnesses, including J. B. Church, Esq., my said counsel, was sworn before the grand jury on the 1st inst., and that, pursuant to an adjournment, some witnesses were examined on the 5th inst., and I was sworn and cautioned by the foreman of the grand jury at about 4:30 p. m. on said day, and notified to appear on the 8th inst. at 2 o'clock p. m. On the evening of said 5th day of November, as we were leaving the grill room of the Palace Hotel, through the billiard room, where we were stopping, while I was in company with Mr. Church, the latter was accosted by a gentleman, whom I

had seen in the grand jury room, and whom I supposed to be one of the members of the United States grand jury. I heard him request Mr. Church to introduce him to his client, Walter K. Freeman, referring to myself. He mentioned his name, which I did not fully gather, and thereupon we went to the opposite side of the billiard room and sat down, and he explained, then, that he was the only man on the jury that knew anything about electrical matters, and he would like to get some points. From this point an interview began, which lasted from about 8 o'clock until midnight, during which time he discussed very freely his experiences as a juror in criminal cases and as a grand juror in the county and federal courts. He, of his own volition, introduced the subject-matters which I had brought to the notice of the United States district attorney, and which were being considered by the United States grand jury, and he stated, among other things, that he had listened to the testimony given in the grand jury room by Warren P. Freeman, and discussed his testimony, and remarked that he would not believe him under oath, because he said that, during the time that Warren P. Freeman was before the grand jury, he acted and told his story in a suspicious way; that he seemed more interested in looking at his boots than in giving an intelligent story of his connection with the affairs which led up to charges being preferred against him before the grand jury. Continuing, he referred to the testimony given by Marvin L. Freeman before the grand jury, discussed it, and said that he did not think Marvin was telling the whole truth; that he believed he was holding something back, and asked me if I knew what it was. The reason he gave for not having confidence in Marvin L. Freeman's testimony was because Marvin seemed to hesitate and think, and acted as though he was endeavoring to tell a fixed-up story, and in this connection he remarked that he thought that a man who was telling the truth would speak up promptly, and would tell the same story forty-seven different times in as many different ways, and still tell the truth.

"During our conversation Mr. Church excused himself for a few moments, and during his absence that person, whose name I later learned was H. J. Summerhayes, began questioning me very closely regarding the financial status of the Ft. Wayne Electric Corporation, whom he seemed to understand was the owner of the inventions in controversy, and he proceeded to inquire whether or not I could secure enough money to handle the case pending before the United States grand jury. He said: 'You must know, Freeman, that if the proper influence is brought to bear you can have done what you want.' Continuing, he made a statement as to his knowledge of jury duty, and the probable influence he would have with the present grand jury, and asked me what it would be worth to the Ft. Wayne Electric Corporation to have H. S. McKaye and Warren P. Freeman indicted for intimidating witnesses. He said: 'You know it would have great influence in the patent office, and will be worth a great deal to you, if this is brought about.' As he continued his conversation, he drifted to a point where he made a comparison between the compensation received by the gentlemen who are members of the United States grand jury, and in this connection remarked: 'We only get two dollars a session,—four dollars a week,—and you fellows are fighting here for patents that are worth millions to whoever wins the suit, and are asking us to go into an investigation at the rate of four dollars a week, and decide a question that would have great influence in the patent office. Now, look here, Freeman; this is not fair. The lawyers are getting big money out of this thing, and I know that the Westinghouse Electric Company has got a whole lot of money available for the purpose of fighting you here; so, why don't you resort to the same means? You know that you could fight the devil out of hell if proper influence was brought to bear.' Continuing in this strain for some time, he continued and said: 'I'll tell you, my opinion is that it is not a fair division of the spoils.' I then inquired whether or not it was a practice in California in fixing juries. He said it was not an uncommon thing to do, but that he had never accepted or had anything to do with any such affairs, because he was a wealthy man, and above such influences. At about this time Mr. Church returned to the billiard room, and Summerhayes' conversation drifted to a recital of personal experiences, and then drifted back again to his intimate acquaintance with certain reputable gentlemen of San Francisco,

and spoke of them in a manner that gave me the impression that his social standing was of the best; that his integrity and influence as foreman of grand juries had never been questioned, and that the juries of which he had been a member in the past had always decided cases as he suggested, and in this connection he said: 'I have been a juror for three years, with the exception of one week; and while acting as such in the criminal courts, every case that was ever tried resulted in a conviction.'

"In this affidavit I have eliminated such matter and such parts of his recital and conversation as seems necessary to intelligently and briefly outline the drift of his remarks, without going into all the details. He quoted certain conversations between members and jurors in the jury room, and in this connection said that there had been a discussion between himself and other members of the United States grand jury respecting the small compensation that they received, which was four dollars a week, for puzzling their heads over the affairs of myself and the Westinghouse Electric Company, which involved millions of dollars. There are other fragments of sentences, interspersed in the conversation, referring to what occurred in the jury room and comments made by the jurors, which it would be impossible to intelligently express without going into a lengthy statement of what was said. And further deponent sayeth not.                    Walter K. Freeman.

"Sworn to before me this 7th day of November, 1895.       J. S. Manley,
      "Commissioner U. S. Circuit Court, Northern District of California."

This affidavit tended to show, not only that Mr. Summerhayes had violated his oath, but that he had been guilty of contempt of court, in misbehaving as a juror in revealing the proceedings of the grand jury and also in discussing matters which had been brought before that body.

On that affidavit the court issued a citation, requiring the respondent to appear here this morning and show cause why he should not be punished for contempt of court. He appeared, and through counsel asked that the witnesses in support of the affidavit might be produced for cross-examination. Pursuant to this request, the witnesses in support of the charges contained in the affidavit were placed on the witness stand and examined as to the matters referred to in the affidavit. Mr. Freeman testified substantially as set forth in the affidavit. He was then cross-examined by counsel for the respondent. Mr. Church, his attorney, was called, and requested to state what occurred on the occasion mentioned in the affidavit. He did so, and confirmed the testimony of Mr. Freeman, in its principal features. He was cross-examined by counsel for respondent. Mr. Seidenberg, a reporter for a morning paper, was also called to testify to certain admissions said to have been made by Mr. Summerhayes at his house on the night of the 6th of November, concerning the same matter. He, also, was cross-examined by counsel for the respondent. The respondent then went upon the stand and testified as to what occurred on this occasion. He has controverted or denied some portions of the testimony delivered by the witnesses in support of the charges contained in the affidavit.

With respect to such portions of that affidavit as charge, or tend to charge, corrupt conduct, it probably involves offenses against the laws of the United States. If so, these matters must be tried elsewhere and by other methods of procedure than that which is now appropriate in this proceeding for contempt. When a person

is charged with the commission of a crime against the United States, he is entitled to have the matter investigated by the grand jury, and, if indicted, to be tried by a jury of his peers. It is not for the court to determine the questions of fact involved in a public offense, or the issues of fact presented in such matters. If the tendency of respondent's conversation with Mr. Freeman was in respect to a violation of law,—if it was for the purpose of opening up negotiations leading to bribery and corruption,—that is a matter that should be investigated by the grand jury, and presented to the court in proper form for trial by a jury. The court has only to deal now with the question of contempt,—to determine whether the orders of this court and the laws governing their enforcement have been violated by the respondent.

Section 725 of the Revised Statutes provides:

"The said courts shall have power to impose and administer all necessary oaths, and to punish, by fine or imprisonment, at the discretion of the court, contempts of their authority: provided, that such power to punish contempts shall not be construed to extend to any cases except the misbehavior of any person in their presence, or so near thereto as to obstruct the administration of justice, the misbehavior of any of the officers of said courts in their official transactions, and the disobedience or resistance of any such officer, or by any party, juror, witness, or other person, to any lawful writ, process, order, rule, decree, or command of said courts."

It will be observed that contempt of court may be committed—First, by the misbehavior of a juror in the presence of the court, or so near thereto as to obstruct the administration of justice; secondly, a contempt of court may be committed by a disobedience of a juror to a lawful command of the court. The oath taken by the respondent and the command given to him by the court was that the counsel of himself and his fellows he should keep secret; or, in other words, that he should not communicate with persons outside of the jury room with respect to any matter under investigation by the grand jury. The law and instructions of the court in this respect were not obscure, and there is no reason why a person should be in doubt as to their command. It is one of the inheritances we have as an English-speaking people, coming down through the long channels of the common law, to respect and sustain the sanctity of the jury room and the secrecy of the procedure of investigation provided for grand jurors. Indeed, the integrity of proceedings in criminal cases depends almost entirely upon the jurors confining themselves to the investigation of only such matters and things as they have received from the court, or from the district attorney, in the grand jury room, and through regular channels.[1] For a juror to receive documents or papers, or anything pertaining to a case, outside of the jury room, is not only clearly in violation of his oath, but it is contrary to the principles of our jurisprudence and the whole system of law we are called upon to administer. If jurors may leave the jury room and privately obtain evidence elsewhere, if the jury can be dismissed

---

[1] A grand jury of the United States does not possess the inquisitorial powers conferred by statute upon state grand juries. Charge to Grand Jury, 2 Sawy. 671.

from a court or jury room, and the individual members be permitted to interview parties or witnesses outside of the jury room, the courts may as well close their doors, and let the administration of justice fall into the hands of those who will deal in it as an article of personal favor or purchasable merchandise. But this is a government of law, and we are charged to execute the law, and to see that it is preserved in all its integrity, and so conduct all the proceedings that not a breath of suspicion should ever properly attach to any verdict or judgment, and when we forget to insist upon all the safeguards that belong to proceedings in courts of law, we must not be surprised to find our form of government under the law a subject of ridicule and derision; indeed, it may not stand the strain of distrust that accompanies irregularity and corruption in the administration of justice.

The court appreciates the unfortunate position of the respondent in this case, as stated by his counsel. He comes here, undoubtedly, with the credit of a reputable citizen. He has borne, heretofore, so far as I know, a good reputation. But he has certainly disobeyed the order of the court. He ought to have thought of his good reputation when confronted with the situation, as it appears here presented to the court by the testimony. He ought not to have approached these men. He ought not to have allowed himself to come in contact with them, or to discuss with them the proceedings of the grand jury, even to the extent he admits. While I am not now considering anything further than the mere fact of the respondent having disobeyed the order of the court, still there clings about the affair the atmosphere of wrong,—serious wrong. There is, I am afraid, something more than the mere disobedience of the order of the court. It is said by counsel that all there was to it was indiscretion, and it has been characterized as though the conduct of the respondent was a matter of possible thoughtlessness. That is not the case. The case cannot be disposed of in that way. It is a serious matter. It must be considered that there was some reason for this juror having a conversation in a public billiard room with Freeman and Church, covering the long time stated in the testimony. It cannot be disposed of as a passing conversation. I think that, while the testimony in this case has been brought to my attention orally, and has not been left to be disposed of by the affidavits of the persons who had knowledge of the facts and the answer of the respondent, I am permitted, under the rules governing the examination of such a case, to determine whether or not the story of the respondent is consistent with the situation. I am bound to say that, from all the statements, I do not think his story is consistent with all the circumstances of the case, even as admitted by himself. The meeting of these persons in a public billiard room, and the claim that the respondent was merely talking to a Mr. Buckman indirectly, and in a formal way, about the case before the grand jury, does not seem to be in accord with the situation of affairs. I am now speaking of the case as presented by the respondent himself, disregarding the statements of Mr. Freeman and Mr. Church. The respondent's own statement of the situation is not sufficient to account for the

interview, or the color he gives to it. I think it is a serious offense. I think it is one of the gravest offenses that has been committed in this district against the regular and proper administration of the law. The respondent must be punished, and I think he ought to be punished severely.

The sentence of the court is that he be imprisoned for the term of six months, ·and that this imprisonment be executed in the county jail of San Francisco.