26 N.J. Super. 514 (1953)
98 A.2d 319
IN THE MATTER OF THE ALLEGED CRIMINAL CONTEMPT OF MYRON JECK.
Superior Court of New Jersey, Appellate Division.
Argued June 22, 1953.
Decided July 2, 1953.
*515 Before Judges FREUND, STANTON and FRANCIS.
*516 Mr. John M. Pillsbury argued the cause for the State of New Jersey, plaintiff-respondent (Mr. J. Victor Carton, Prosecutor of Monmouth County, attorney).
Mr. Harry Green argued the cause for Myron Jeck, defendant appellant.
The opinion of the court was delivered by FRANCIS, J.C.C. (temporarily assigned).
Appellant, Myron Jeck, was convicted of criminal contempt following jury trial in the Law Division of the Superior Court. He now appeals, charging certain errors in the proceedings.
On January 2, 1952 Jeck became a member of the grand jury of Monmouth County and took the customary oath of office. A session of the jury was held that day.
The evidence discloses that at the time a complaint against one Eugene Capobianco, Jr., for assault and battery was awaiting action by the grand jury. While the evidence on the subject is in conflict it was open to the jury to find that Jeck knew about the complaint.
The complainant in the case was Felix Giordano. Jeck was a friend of Capobianco's father and he had known Giordano for 15 or 20 years.
On January 4, 1952 Jeck paid a call on Giordano, who apparently was still confined to his home on account of the injuries suffered in the assault. It was described as a friendly visit, although he was not in the habit of making such visits.
While there is no dispute that the conversation got around to the pending complaint and its disposition, there is a conflict as to what was said on the subject. Giordano asserted that Jeck told him the matter had been referred to the grand jury and vigorously solicited the withdrawal of the complaint. When the request met with refusal, appellant is alleged to have said that he was a member of the grand jury and "I don't stand for the conviction of a boy like that."
Giordano also testified that he said to Jeck:
"If you don't stand for no conviction you better disqualify yourself. * * * If you convinced in your mind, you got it all made *517 up for no conviction, for no indictment. * * * You better disqualify yourself."
To which, he said, Jeck replied:
"No, I no disqualify myself."
In addition, there was a general discussion about "the charge, how it happened and he asked me how I was beaten."
Corroboration of this testimony was offered by Giordano's wife. She claimed to have heard Jeck say, "I know they're not going to do anything to him because I'm on the Grand Jury." and "I'm on the Grand Jury and I don't believe in punishment for the boy."
Appellant denied this conversation, maintaining that during the discussion about the assault he told Giordano he was on the grand jury and that since he knew both parties he was going to ask to be excused from hearing the case. And incidentally he said:
"I only know that it's a Juvenile case, and that's where it belongs, and that's where it should be handled by the Juvenile Court."
However, the jury found that as an officer of the court he was guilty of misbehavior in his official transactions in violation of N.J.S. 2A:10-1(b), and consequently guilty of criminal contempt. As a result of the conviction a fine of $300 was imposed.
At the opening of the trial a motion was made to dismiss the complaint for criminal contempt on the ground of autrefois convict.
In this connection it appears that after the conversation referred to, Giordano went to see the assignment judge of the county and reported the incident to him. A short time thereafter a hearing was held before this judge, at the conclusion of which an order was entered reciting that
"the Court being satisfied that said Myron Jeck is guilty of misbehavior in his official transactions as such grand juror,
It is on this 22nd day of January 1952 ordered that Myron Jeck be and he is hereby discharged as a member of said grand jury and *518 that his name be stricken from any future list of grand jurors in and for the County of Monmouth.
Done this day under Revised Statutes 2:15-1 and Revised Statutes 2A:78-2."
It is perfectly plain that this was not a criminal contempt proceeding. No such charge was made and no notice or order to show cause under Rule 3:80-2 was served, and no finding of criminal contempt was made. The hearing was held under N.J.S. 2A:78-2 for the purpose of obtaining an order by the assignment judge discharging Jeck from the grand jury.
Under N.J.S. 2A:78-1 and 2, a grand juror can be discharged from service only by the assignment judge or a judge designated by him. The reference in the order of discharge to R.S. 2:15-1 (which should have been to N.J.S. 2A:10-1, because the revision was then in force), which is the criminal contempt statute, was not in any wise to indicate that the action was one for contempt but simply to point to the reason for the discharge, namely, for misbehavior in his official transactions as such grand juror.
The reference to the nature of the disqualifying conduct which invoked the order was manifestly to comply with the direction of the Supreme Court in State v. Codington, 80 N.J.L. 496 (Sup. Ct. 1911), affirmed 82 N.J.L. 728 (E. & A. 1911).
In that case two grand jurors were discharged after being drawn but before being impaneled, the statement of the trial judge being "for reasons best known to the Court." When this action was attacked, Chief Justice Gummere said:
"* * * Excusing of a grand juror by the court, of its own motion, for sufficient cause, is a legitimate exercise of judicial power."
Even where no reasons are stated, it will be assumed that they were of such a character as to justify the action, although
"Ordinarily, it is better that the reasons upon which the court acts should be publicly stated, * * *."
*519 An appeal was taken from the order of discharge and it was dismissed in a per curiam opinion to the effect that the propriety of the discharge was then moot because the grand jury of which Jeck was a member had completed its term. However, the portion of the order appealed from by which his name was stricken from any future list of grand jurors, was set aside as improper because
"under N.J.S. 2A:70-2 the qualifications of jurors are determined by appropriate reviewing officers in advance of the opening of each stated court session. Accordingly, should Jeck's name appear on a future list of grand jurors, his fitness for jury service may then be considered." In the Matter of Qualification of Myron Jeck to Serve as a Grand Juror for the January 1952 Session of the Grand Jury, 22 N.J. Super. 197 (App. Div. 1952).
The title of the matter showed that it was not a criminal contempt cause, and the opinion of the Appellate Division confirms this view. Criminal contempt is a misdemeanor  a crime. Zimmerman v. Zimmerman, 12 N.J. Super. 61 (App. Div. 1950). No one who has been convicted of a crime is qualified to serve as a grand juror. N.J.S. 2A:69-1. If there was any indication that the proceeding before the assignment judge was for criminal contempt, since the conviction would have barred Jeck from future service, it seems highly unlikely that the order would have been modified as was done.
During the pendency of the first appeal this contempt action was instituted under Rule 3:80-2. It is the only criminal prosecution that was brought against appellant.
In our judgment Jeck has been subjected to but one trial and conviction for criminal contempt. Consequently the defense of autrefois convict is not maintainable.
It is contended that error was committed in the refusal to grant the motion for a judgment of acquittal for failure of proof that a criminal contempt had been committed.
The grand jury is an arm of the court  a judicial body  and its members are officers of the court. In re Schwartz, 133 N.J.L. 79 (Sup. Ct. 1945), reversed on other grounds 134 N.J.L. 267 (E. & A. 1946); Ex parte Bruns, *520 15 Cal. App.2d 1, 58 P.2d 1318 (Dist. Ct. App. 1936). It is the settled doctrine of New Jersey that any act or conduct which obstructs or tends to obstruct the course of justice constitutes a contempt. In re Caruba, 139 N.J. Eq. 404 (Ch. 1947), affirmed 140 N.J. Eq. 563 (E. & A. 1948), certiorari denied 335 U.S. 846, 69 S.Ct. 69, 93 L.Ed. 396 (1948). So any act or conduct on the part of a grand juror in his official transactions which obstructs or tends to obstruct the course of justice constitutes misbehavior within the meaning of N.J.S. 2A:10-1 and a criminal contempt.
Thus, if Jeck, in his capacity as a grand juror, knowing that the complaint in question had been referred to the grand jury and knowing or believing or anticipating that it was to be considered by the grand jury of which he was a member, visited Giordano and sought the withdrawal of the complaint, he was guilty of misbehavior sufficient to justify a conviction of criminal contempt. This is substantially the issue that was submitted to the jury for determination, and in the face of the proof in the record, we find no error in doing so and in refusing to grant an acquittal.
Of course, if the jury believed the testimony that in addition to seeking the recall of the complaint, Jeck said that upon refusal of Giordano to do so he would endeavor to prevent an indictment, the more gross would be the character of his misbehavior.
The Supreme Judicial Court of Massachusetts in Commonwealth v. McNary, 246 Mass. 46, 140 N.E. 255, 29 A.L.R. 483 (1923), in discussing the subject of contempt in connection with the functioning of grand juries, said:
"It is an inevitable consequence of these principles that the court has the power and is charged with the duty of punishing for contempt any one whose conduct interferes with or has a tendency to obstruct the grand jury. Such conduct is as much contempt, and punishable as such, as that which interferes with or has a tendency to obstruct the administration of justice in the courts in another form or manner. It may be as necessary to put forth the power of the court to protect itself against contempts committed against this instrumentality of justice as against others. It is a contempt of the court of which the grand jury is a part to obstruct its normal and legal functions."
*521 An informative and quite apposite case on the present issue is In re Summerhayes, 70 F. 769 (D.C. 1895). There it appeared that while the grand jury was still in session, a juror interviewed the person who caused an alleged crime to be investigated, advised him of certain testimony given to the grand jury, and discussed with him other matters then pending before it. The juror was held guilty of contempt, the court saying:
"The oath taken by the respondent and the command given to him by the court was that the counsel of himself and his fellows he should keep secret; or, in other words, that he should not communicate with persons outside of the jury room with respect to any matter under investigation by the grand jury. The law and instructions of the court in this respect were not obscure, and there is no reason why a person should be in doubt as to their command. * * * For a juror to receive documents or papers, or anything pertaining to a case, outside of the jury room, is not only clearly in violation of his oath, but it is contrary to the principles of our jurisprudence and the whole system of law we are called upon to administer. If jurors may leave the jury room and privately obtain evidence elsewhere, if the jury can be dismissed from a court or jury room, and the individual members be permitted to interview parties or witnesses outside of the jury room, the courts may as well close their doors, and let the administration of justice fall into the hands of those who will deal in it as an article of personal favor or purchasable merchandise."
Under the circumstances it was not error to refuse to grant a judgment of acquittal. In addition we have examined the other reasons relied upon by appellant and find no basis for reversal therein.
The judgment of conviction is affirmed.