741 A.2d 143 (1999)
326 N.J. Super. 304
STATE of New Jersey, Plaintiff-Respondent,
v.
Lawrence WHITE, Defendant-Appellant.
Superior Court of New Jersey, Appellate Division.
Argued October 27, 1999.
Decided December 8, 1999.
James K. Smith, Jr., Assistant Deputy Public Defender, for defendant-appellant (Ivelisse Torres, Public Defender, attorney; Mr. Smith, of counsel and on the brief).
Linda K. Danielson, Deputy Attorney General, for plaintiff-respondent (John J. Farmer, Jr., Attorney General, attorney; Ms. Danielson, of counsel and on the brief).
Before Judges BAIME, EICHEN and WECKER.
The opinion of the court was delivered by BAIME, P.J.A.D.
This appeal presents novel questions concerning the role of a prosecutor in presenting a case to a grand jury. At issue is whether a prosecutor may screen questions grand jurors wish to propound to witnesses. We find no constitutional infirmity in this practice so long as the prosecutor's exercise of this authority does not infringe upon the grand jury's independence.

I.
Following a protracted jury trial, defendant was convicted of aggravated manslaughter (N.J.S.A. 2C:11-4). Although the factual issues were hotly contested, the jury could reasonably have found from the evidence that defendant severely beat the two year old victim, Nathaniel Bryant, Jr., resulting in massive brain injuries and death. While there was evidence of sexual *144 abuse, the jury apparently discounted it, thus acquitting defendant of purposeful or knowing murder (N.J.S.A. 2C:11-3a(1) and (2)) and felony murder (N.J.S.A. 2C:11-3a(3)).
Because the principal issue concerns the conduct of the grand jury proceedings, we need not recount the facts at length. Defendant's sister, Gwen London, was the victim's godmother. Defendant resided at his sister's house with her two children, Curtis London and Walter White, although there is evidence that White moved out of the house long before the victim's death. While Gwen owned the house, she actually resided at a different address with her two other children, Jeffrey and Steven Carter. However, these living arrangements were fluid.
On the morning of the incident, Annette Baker dropped off her son, Nathaniel, at Gwen London's house. Defendant was to babysit for Nathaniel. As was their practice, Annette's other son, Bruce, escorted Nathaniel to the front door. There is some suggestion that Walter White admitted Nathaniel into the house, but as we noted, the evidence strongly supports the thesis that White had moved out of the house before Nathaniel's death and only visited intermittently. In any event, present in the house were defendant, Curtis London, and Jeffrey and Steven Carter.
The day passed uneventfully. Although Nathaniel fell while playing in a nearby park, it appears that he "got up and ran off" immediately without suffering any serious injury. That evening, defendant and the children ate dinner and watched television. Nathaniel went to sleep in defendant's upstairs bedroom. At approximately midnight, Annette appeared to pick up Nathaniel, but at defendant's urging, decided to leave the child at the London address. This was the first time Annette allowed Nathaniel to remain overnight.
The next morning, Jeffrey awoke at 7:30 to find defendant watching television in the living room. At one point, defendant went upstairs. Jeffrey heard defendant exclaim "man." From that point on, defendant appeared somewhat nervous, smoking cigarettes one after the other. When Gwen telephoned, defendant told her that he could not waken Nathaniel. Gwen was not alarmed, however, believing that the child was merely tired.
Later in the morning, defendant announced that he was going to wake up Nathaniel. When Curtis entered defendant's bedroom, he saw defendant "shaking" Nathaniel. Nathaniel's eyes were "glassed over," rolling back into his head, his body was limp and he did not appear to be breathing. Curtis telephoned Gwen, who arrived within minutes. Emergency medical personnel were summoned and responded shortly thereafter. The child was not breathing, and a heart monitor detected no electrical activity. He was transported to a nearby hospital where he was pronounced dead.
The cause of death was an "acute left subdural hemorrhage and massive cerebral edema." The cerebral edema was the result of a severe blow to the head which occurred approximately three to nine hours before death. Additionally, there were significant signs of sexual abuse. The autopsy disclosed "extensive deep hemorrhages" in the subcutaneous tissues, fat and muscles of the buttocks. The child's perineum was a purplish blue. There was scarring of the "anal mucosa" and evidence of multiple tears of the anal opening. The child's scrotum was swollen and there were hemorrhages in the testicles. Except for the injuries to the brain, the damage to the child's body would have caused "excruciating" pain. Although the dilation of the child's anus was caused over a period of time, the other injuries were of recent origin. A fall could not possibly have caused these injuries.
When questioned, defendant initially implied that Nathaniel's head injury was caused by the fall in the park. However, the officers escorted defendant to the scene of the fall, where the ground was *145 "mushy and soft." Defendant subsequently claimed that the left side of Nathaniel's head struck the sideboard of the bed three or four times while he was attempting to revive the child. Using a doll provided by the police, defendant demonstrated how the child's head came in contact with the wall. When told that his demonstration was not consistent with the severity of the injuries inflicted, defendant admitted that he may have used greater force. Defendant denied having any sexual contact with the child, but claimed that he "might have" grabbed Nathaniel's testicles while trying to revive him.
At trial, defendant denied any involvement in Nathaniel's death and claimed that his statement was coerced. Defendant testified that the police repeatedly denied his requests for a lawyer. In his testimony, defendant recounted the circumstances surrounding Nathaniel's fall the day before the child's death. According to defendant, Nathaniel suffered a minor "bump" on his head, but appeared to be fine. Defendant testified that on the morning Nathaniel died, the child was "balled up" in a fetal position, but nothing appeared to be wrong with him. Later in the morning when defendant went upstairs to check on the child, he found Nathaniel "breathing real hard" with "white stuff coming out of his mouth." It was at that point that Gwen and ultimately the emergency medical personnel were summoned.

II.
Although other issues are raised, defendant's principal argument is that the indictment returned by the grand jury was tainted by prosecutorial misconduct. We briefly summarize the facts salient to this contention.
This case was presented to two grand juries. Because the investigation was not completed when the first grand jury's term concluded, a taped transcription of the proceedings was played to the second grand jury which also heard live testimony.
In his presentation to the first grand jury, the prosecutor elicited testimony from law enforcement officers who conducted the investigation, from Gwen and Curtis London, and from Annette Baker. After each witness testified, the prosecutor directed him or her to step out of the grand jury room. He then asked the grand jurors whether they had any questions. Most of the questions were innocuous and in those instances, the witnesses were directed to reappear and clarify their testimony as requested by the grand jurors.
After Annette Baker's testimony, she too was asked to remain in the anteroom while the prosecutor asked the grand jurors whether they had additional questions to be propounded to the witness. One of the grand jurors noticed a discrepancy in the testimony. Specifically, Baker testified that she dropped Nathaniel off at 12:30 p.m., while other witnesses said it was approximately 8:00 or 9:00 a.m. Another grand juror noted that Baker testified Walter White was present in the house when Nathaniel was admitted. A third grand juror wanted to question Baker concerning her knowledge of Nathaniel's health. The prosecutor agreed to clarify these subjects. Baker returned to the grand jury room. She insisted that she did not drop off Nathaniel as early as 8:00 or 9:00 a.m. Baker further testified that Nathaniel was in good health. And finally, the witness recalled that, while she remained in her automobile, her son Bruce accompanied Nathaniel to the front door and that the child was admitted into the house by Walter White. Baker was then excused.
In the colloquy that followed, the grand jurors agreed that all but one of their questions had been answered, the exception being their inquiries concerning Walter White. The prosecutor responded correctly that Curtis London testified White was not present on the weekend that Nathaniel died. However, he agreed to present an additional witness to respond to the *146 grand jurors' questions. At that point, one of the grand jurors asked whether Nathaniel's father would be called as a witness, noting that the injuries could have been inflicted when the child was in his father's care. Referring to the autopsy, the prosecutor noted that the injuries causing Nathaniel's death were "fresh" and were inflicted within hours of the child's death. The prosecutor went on to explain that although there was evidence the child had been abused over a lengthy period of time, he could not "put a case together" for injuries suffered by Nathaniel prior to the trauma that caused his death.
It was at this point that the term of the first grand jury expired. The second grand jury was then impaneled and heard a tape recording of the earlier proceedings. Recognizing that issues pertaining to Walter White remained unresolved, the prosecutor presented Investigator Arnold Worthington. Worthington testified that he interviewed Jeffrey Carter and Curtis London and was told by both men that Walter White was not present in the house when Nathaniel was dropped off and later killed. Worthington further related that his interview with White corroborated the account given by Carter and London that White was not a resident of the house at the time of Nathaniel's death. Moreover, Worthington testified that Bruce Baker appeared confused when questioned about the possibility that White was present, and that Annette Baker told him that she had not actually seen White when she dropped off Nathaniel at the London residence. Worthington described Bruce Baker as somewhat "slow."
Following Worthington's testimony, the witness was temporarily excused and the prosecutor asked whether the grand jurors had additional questions. One grand juror wanted Worthington to clarify his characterization of Bruce Baker's mental acuity. Another grand juror asked for additional testimony concerning the identity of the individual who summoned medical personnel. Worthington then reappeared before the grand jury and clarified both subjects. It is against this factual backdrop that we consider defendant's argument.
Defendant contends that grand jurors have an absolute independent right to require the presence of witnesses and to propound any questions they wish. Noting that the reception before a grand jury of inadmissible or even illegally obtained evidence procured in violation of an individual's constitutional rights does not serve to vitiate the resulting indictment, see United States v. Calandra, 414 U.S. 338, 345, 94 S.Ct. 613, 618, 38 L.Ed.2d 561, 569 (1974); United States v. Blue, 384 U.S. 251, 255, 86 S.Ct. 1416, 1419, 16 L.Ed.2d 510, 514 (1966); Lawn v. United States, 355 U.S. 339, 349-50, 78 S.Ct. 311, 317-18, 2 L.Ed.2d 321, 330 (1958); Costello v. United States, 350 U.S. 359, 362, 76 S.Ct. 406, 408, 100 L.Ed. 397, 408 (1956); Holt v. United States, 218 U.S. 245, 247-48, 31 S.Ct. 2, 4, 54 L.Ed. 1021, 1026 (1910), defendant asserts therefore that a prosecutor has no need or right to screen grand juror questions or otherwise interfere with its independent investigation. We reject this argument.
Since early times, the right to indictment by grand jury has been enshrined in our Constitution and has played a central role in the enforcement of the criminal law. State v. Hogan, 144 N.J. 216, 227, 676 A.2d 533 (1996); see N.J. Const. of 1844, art. I, ¶ 9; N.J. Const., art. I, ¶ 8. The purposes of the grand jury include bringing the guilty to trial as well as protecting the innocent from unfounded prosecution. State v. Hogan, 144 N.J. at 228, 676 A.2d 533; see also State v. Murphy, 110 N.J. 20, 29, 538 A.2d 1235 (1988); State v. Del Fino, 100 N.J. 154, 165, 495 A.2d 60 (1985); State v. New Jersey Trade Waste Ass'n, 96 N.J. 8, 27, 472 A.2d 1050 (1984); Trap Rock Indus., Inc. v. Kohl, 59 N.J. 471, 487-88, 284 A.2d 161 (1971), cert. denied, 405 U.S. 1065, 92 S.Ct. 1500, 31 L.Ed.2d 796 (1972). Our Supreme Court has recognized that the grand jury is the "`primary security to the innocent against *147 hasty, malicious and oppressive persecution.' " State v. Del Fino, 100 N.J. at 164, 495 A.2d 60 (quoting Wood v. Georgia, 370 U.S. 375, 390, 82 S.Ct. 1364, 1373, 8 L.Ed.2d 569, 580 (1962)). Thus, the grand jury's mission is to "clear the innocent, no less than to bring to trial those who may be guilty." United States v. Dionisio, 410 U.S. 1, 16-17, 93 S.Ct. 764, 773, 35 L.Ed.2d 67, 81 (1973).
Despite the grand jury's exalted status in the administration of the criminal law, the triadic relationship between that body, the prosecutor and the courts has been the source of much litigation and concern. See, e.g., State v. Hogan, 144 N.J. at 233-35, 676 A.2d 533; State v. Perry, 124 N.J. 128, 168, 590 A.2d 624 (1991); State v. Murphy, 110 N.J. at 30, 538 A.2d 1235; State v. Doliner, 96 N.J. 236, 249-52, 475 A.2d 552 (1984); State v. Vinegra, 73 N.J. 484, 497-505, 376 A.2d 150 (1977) (Hughes, C.J., dissenting); State v. Engel, 249 N.J.Super. 336, 359, 592 A.2d 572 (App. Div.), certif. denied, 130 N.J. 393, 614 A.2d 616 (1991); State v. Childs, 242 N.J.Super. 121, 129, 576 A.2d 42 (App.Div.), certif. denied, 127 N.J. 321, 604 A.2d 596 (1990); State v. Vasky, 218 N.J.Super. 487, 490-91, 528 A.2d 61 (App.Div.1987); State v. Hilltop Private Nursing Home, Inc., 177 N.J.Super. 377, 388-89, 426 A.2d 1041 (App.Div.1981); State v. Schamberg, 146 N.J.Super. 559, 563, 370 A.2d 482 (App. Div.), certif. denied, 75 N.J. 10, 379 A.2d 241 (1977); State v. Hart, 139 N.J.Super. 565, 567-68, 354 A.2d 679 (App.Div.1976). The United States Supreme Court has held that the federal judiciary does not possess the authority to prescribe standards of prosecutorial conduct before the grand jury. United States v. Williams, 504 U.S. 36, 46-47, 112 S.Ct. 1735, 1742, 118 L.Ed.2d 352, 365 (1992). In reaching this conclusion, it was emphasized that "the grand jury is an institution separate from the courts, over whose functioning the [judiciary] do[es] not preside." Id. at 47, 112 S.Ct. at 1742, 118 L.Ed.2d at 365. Legal commentaries have criticized this view, suggesting that it tends to impair, rather than to preserve, the grand jury's historical independence. See Fred A. Bernstein, Behind the Gray Door: Williams, Secrecy and the Federal Grand Jury, 69 N.Y.U. L.Rev. 563, 587-91 (1994); see also Patrick F. Mastrian, Indianhead Poker in the Grand Jury Room: Prosecutorial Suppression of Exculpatory Evidence, 28 Va. L.Rev. 1377, 1379 (1994).
We in New Jersey have taken a different tack. Historically, "[t]he grand jury [has been considered] an arm of the courta judicial body." In re Jeck, 26 N.J.Super. 514, 519, 98 A.2d 319 (App. Div.), certif. denied, 13 N.J. 429, 100 A.2d 215 (1953); see also State v. Hogan, 144 N.J. at 236, 676 A.2d 533; State v. Murphy, 110 N.J. at 30-33, 538 A.2d 1235. While we subscribe to the view that the grand jury should not be a captive of any of the three branches, we recognize that it nevertheless exercises its powers under the authority and supervision of the judiciary. The Constitution contains no command that the grand jury be hermetically sealed.
Our Supreme Court has vested the assignment judge with plenary responsibility for the administration of grand juries in his or her vicinage. R. 3:6-1; see also In re Supervision and Assignment of the Petit Jury Panels, Essex County, 60 N.J. 554, 559-62, 292 A.2d 4 (1972). Thus, while the grand jury is not "an officious meddler," In re Addonizio, 53 N.J. 107, 124, 248 A.2d 531 (1968), it "may investigate upon its own suggestion," ibid, and its "sources of information are widely drawn," United States v. Calandra, 414 U.S. at 344-45, 94 S.Ct. at 618, 38 L.Ed.2d at 569, "it necessarily looks to the judge presiding in the county ... for instructions on the law to govern its deliberations...." In re Camden County Grand Jury, 10 N.J. 23, 34, 89 A.2d 416 (1952). Of course, "[w]e recognize that there is no impropriety in the prosecutor assisting the investigation and examination of witnesses; in advising the grand jury as to the admissibility of *148 evidence and the proper mode of procedure and in explaining the testimony with reference to the law of the case." State v. Hart, 139 N.J.Super. at 567, 354 A.2d 679. Recognizing the necessary day-by-day assistance provided the grand jury by the prosecuting attorney, we nevertheless emphasize the primacy of the assignment judge's role.
Within this analytical framework, we note that our rules do not provide a specific format for examining witnesses before the grand jury. We nevertheless perceive substantial utility in a rule allowing prosecutors to screen grand juror questions, subject to the right of the assignment judge to intercede upon an appropriate request. Such a practice prevents the unintentional admission of prejudicial matters, and permits the prosecutor to frame the issues in an intelligent manner. The viability of a grand jury's finding respecting the presence or absence of probable cause will thusly be enhanced. While there is no unanimity on the subject, several jurisdictions have approved the practice of prosecutorial filtering of grand juror questions. See People v. Bergen, 883 P.2d 532, 542 (Colo.App.1994); People v. Brown, 87 Misc.2d 403, 406, 384 N.Y.S.2d 968, 971 (Sup.Ct.1976); State v. Babayan, 106 Nev. 155, 787 P.2d 805, 816 (1990).
Of course, the legitimate inquiries of a grand juror should not be frustrated under the guise of screening. See United States v. Samango, 607 F.2d 877 (9th Cir.1979). However, we are confident that the assignment judge's instructions to the grand jury at its empaneling can alleviate, if not eliminate, this potential problem.[1] The current practice of assignment judges is to charge the grand jury that it is "not confined in [its] investigation to matters which are formally brought to [its] attention by the prosecutor," and that it "may decide that there are conditions that warrant further investigation." Grand jurors are commonly told that they may request the appearance of "additional witnesses" and that they have the right to ask additional questions. Additionally, the assignment judge generally apprises the grand jurors that "[i]f any difficulties arise in this regard," he or she is "always available to respond to... request[s] for additional instruction[s]." These instructions were given to both grand juries in this case.
We do not suggest that it is the assignment judge's role to carefully monitor the proceedings before the grand jury on a day-by-day basis. Nor is it his or her responsibility to apply strictly the New Jersey Rules of Evidence. However, in the rare case in which the prosecutor and the grand jury do not agree respecting what questions are to be propounded to a witness, the assignment judge should be informed of the impasse and his or her decision must prevail.
Applying these principles, we find no abuse of the prosecutor's authority. It is abundantly plain that members of the first and second grand juries were well aware of their right to propound questions and seek additional evidence. Although it appears that the prosecutor was not present when the second grand jury heard the tape of the earlier proceedings, the assignment judge's instructions were unambiguous and clearly apprised the grand jurors of their rights and responsibilities. We do not agree with defendant's contention that the prosecutor dissuaded the grand jurors from propounding additional questions. To the contrary, the record discloses that both the first and second grand juries freely availed themselves of this right. We discern no irregularity of sufficient moment to compel vitiation of the indictment.

III.
Defendant also contends that the trial court's instructions on aggravated manslaughter constituted plain error, and that *149 the sentence imposed was manifestly excessive. These arguments clearly lack merit. R. 2:11-3(e)(2).
As to the jury instructions, there can be no question but that the charge correctly conveyed the applicable principles of law. We reject defendant's claim that the jury may have convicted him on the thesis that he should have procured medical assistance more quickly. While it would have been preferable had the judge more precisely related the facts to the law in his instructions, see State v. Gartland, 149 N.J. 456, 475, 694 A.2d 564 (1997); State v. Concepcion, 111 N.J. 373, 379, 545 A.2d 119 (1988), the charge given, as a whole, was consistent with the factual theories advanced by the parties. Defendant's failure to submit a request to charge or interpose a timely objection constitutes strong evidence that the error belatedly raised here was actually of no moment. We find no error capable of producing an unjust result.
We perceive no sound basis to disturb the sentence. The sentencing judge identified and weighed the applicable aggravating and mitigating factors, and the punishment imposed does not shock the judicial conscience.
Affirmed.
NOTES
[1] Although not provided by the parties, we have obtained the video cassette of the assignment judge instructing the grand jury, which was played for both grand juries.