**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court."
Although it is posted on the internet, this opinion is binding only on the
parties in the case and its use in other cases is limited. R.1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0819-15T2

STATE OF NEW JERSEY,

    Plaintiff-Respondent,

v.

DAIQUAN CRUEL,

    Defendant-Appellant.

_____

Submitted on June 6, 2017 — Decided July 14, 2017

Before Judges Gilson and Sapp-Peterson.

On appeal from Superior Court of New Jersey, Law Division, Essex County, Indictment No. 14-09-2260.

Joseph E. Krakora, Public Defender, attorney for appellant (Jaime Beth Herrera, Assistant Deputy Public Defender, of counsel and on the brief).

Carolyn A. Murray, Acting Essex County Prosecutor, attorney for respondent (Barbara A. Rosenkrans, Special Deputy Attorney General/Acting Assistant Prosecutor, of counsel and on the brief).

PER CURIAM

    A jury convicted defendant Daiquan Cruel of second-degree aggravated assault, N.J.S.A. 2C:12-1(b)(1). He was sentenced to

eight years in prison subject to eighty-five percent parole ineligibility as prescribed by the No Early Release Act (NERA), N.J.S.A. 2C:43-7.2. Defendant appeals his conviction arguing that there was insufficient evidence to identify him as the assailant and that the jury instructions were inadequate. We affirm.

I.

The charge against defendant arose from the beating of his uncle, S.C.[1] The State's theory was defendant assaulted his uncle after learning that the family dog had been taken away because it had bitten one of the uncle's sons.

Defendant had previously lived with his uncle, his uncle's girlfriend, K.C., and the uncle's two sons, T.C. and C.C. Defendant also often visited his uncle and the uncle's family.

The assault on the uncle occurred on April 28, 2014. At that time, the uncle was living in an apartment with his two sons and K.C. K.C. is blind.

The uncle testified that he was drinking heavily on April 28, 2014, and he had limited recollection of that day. He recalls drinking alcohol on the front porch of his apartment building. Later, he recalls going inside and passing out on a mattress, which was in the front living room of the apartment. The next

---

[1] To protect the privacy interests of the victim and witnesses, we use initials.

A-0819-15T2

thing the uncle remembers was waking up in a hospital room. Accordingly, the uncle had no recollection of the assault and could not identify his assailant.

Following the assault, the uncle was in a coma for a week and he was hospitalized for almost three weeks. He testified that after his release from the hospital, he had problems with the left side of his body, including not being able to walk straight. In addition, the uncle testified that he had a hard time remembering things.

The uncle's son, T.C., who was seventeen at the time, testified that on the day of the assault the family dog had bitten him. The dog was brought to the apartment by T.C.'s aunt, who was defendant's mother. After the dog bit T.C., the police responded and ultimately the Humane Society took the dog.

T.C. went on to testify that at some time between 1 a.m. and 2 a.m. on April 29, 2014, he was woken by a commotion. T.C. got up and found his father on the mattress in the front living room. His father was bleeding profusely from his head and he was not responsive. T.C. stated that he did not see anyone else in the apartment at that time besides his brother and K.C. T.C. recalls hearing K.C. on the phone speaking with a 911 operator. T.C. also observed that the front door of the apartment was open, the chain had been "popped," and a chair and a bucket had been knocked over.

A-0819-15T2

K.C.'s recollection and testimony differed from the testimony of T.C. K.C. testified that she had been asleep for several hours in her bedroom and she woke up when she heard T.C. yelling. She recalls T.C. stating "[h]e's killing him. He's killing him." K.C. asked T.C. what he was talking about and T.C. responded: "Day-Day, he's killing him." Day-Day was the nickname for defendant.

K.C. called 911. While she was on the phone with a 911 operator, she yelled "Day-Day, what are you doing?" K.C. testified that she knew defendant was in the apartment because T.C. told her he was there and because she heard defendant telling his uncle: "I'm gonna be here every day [un]til you get my dog back."

At trial, the State played a recording of K.C.'s 911 call. Initially, K.C. requested an ambulance. She then stated: "Day-Day! Leave, Day-Day! Day-Day! Please I got an ambulance coming - -." K.C. went on to explain to the 911 operator that she is blind and she could not see what was going on. At one point, on the 911 recording, someone in the background asked, "[K.C., you're] calling the cops on me?" Then K.C. responded: "No. I'm calling the ambulance!" Later, an emergency medical personnel asked: "Okay, but why is your son saying, 'you calling the cop on me'" and K.C. responded: "No, that's not my son, that's my, um, my husband's nephew."

A-0819-15T2

Thereafter, T.C. got on the 911 call and stated that his father "just got beat up" in the living room. When asked if the person who beat up his father was still there, T.C. responded: "No, I just - - he broke in and did it. And then he ran." T.C. never identified or mentioned defendant during the 911 call.

Defendant also testified at trial. He denied assaulting his uncle and stated that he was not at the apartment at the time of the assault. He went on to testify that he became aware of the assault the next day.

Several days after the assault, defendant was arrested and, thereafter, he was indicted for aggravated assault and third-degree terroristic threats, N.J.S.A. 2C:12-3(b). After hearing the evidence, including the witnesses' testimony, the jury found defendant guilty of aggravated assault, but acquitted him of the charge of terroristic threats.

## II.

Defendant now appeals his conviction and argues:

> POINT I — THE CONVICTION FOR AGGRAVATED ASSAULT SHOULD BE VACATED BECAUSE THE STATE FAILED TO PROVE THE OFFENSE BEYOND A REASONABLE DOUBT

> POINT II — THE TRIAL COURT'S FAILURE TO PROVIDE ANY GUIDANCE TO THE JURY AS TO HOW TO ASSESS THE RELIABILITY OF THE VOICE IDENTIFICATION AND THE COURT'S FAILURE TO PROVIDE A HAMPTON/KOCIOLEK CHARGE REQUIRES REVERSAL OF DEFENDANT'S CONVICTION

A.   The Sufficiency of the Evidence: Voice Identification

Defendant argues that the only witness who identified him was K.C., and because K.C. is blind, she only identified him by his voice.  Defendant then contends that K.C.'s voice identification was insufficient to prove beyond a reasonable doubt that he was the assailant.

A lay witness can identify the voice of a speaker provided the witness' opinion "(a) is rationally based on the perception of the witness and (b) will assist in understanding the witness' testimony or in determining a fact at issue."  N.J.R.E. 701; see also State v. Perez, 150 N.J. Super. 166, 170 (App. Div.), certif. denied, 75 N.J. 542 (1977).  Voice-identification testimony "is generally admissible provided that the witness has an adequate basis for comparison of defendant's voice with the voice which he [or she] identifies as that of the accused."  State v. Johnson, 138 N.J. Super. 579, 582 (App. Div.), certif. denied, 71 N.J. 340 (1976).  To satisfy the first requirement of N.J.R.E. 701, the witness' "perception . . . [must] rest on the acquisition of knowledge through use of one's sense of . . . hearing."  State v. McLean, 205 N.J. 438, 457 (2011).

Generally, the admission of a voice identification is subject to the same test of suggestiveness and reliability as any other identification.  State v. Clausell, 121 N.J. 298, 328 (1990)

(citing Johnson, supra, 138 N.J. Super. at 582); see also State v. Henderson, 208 N.J. 208, 218-19 (2011) (setting forth the standard for determining the admissibility of eyewitness identification).

Here, K.C. was familiar with and knew defendant. Moreover, she identified defendant without any prompting or suggestion by law enforcement officers.

Defendant argues that K.C.'s voice identification was unreliable because K.C. was under stress at the time of the incident, she acknowledged that defendant did not have a particularly distinctive voice, and the police had failed to confirm that K.C. had the ability to identify defendant. We reject all of these arguments because they go to the weight, but not the admissibility, of the voice identification.

K.C. testified that she had lived with defendant for over a month and that defendant occasionally visited his uncle and her. Accordingly, K.C. had conversed with defendant and had heard his voice on other occasions. K.C. also testified that she recognized defendant's voice "[b]y the tone . . . like the deepness or the softness." Consequently, K.C. testified that she was familiar with and recognized defendant's voice.

Thus, it was for the jury to determine whether K.C.'s voice identification was believable. The jury made that determination.

Accordingly, there was sufficient evidence to prove beyond a reasonable doubt that defendant assaulted his uncle.

B.    The Jury Instructions on Voice Identification

The trial court instructed the jury on how it must evaluate the voice identification of defendant. Using the model jury charge on identification, the judge tailored the charge to the voice identification provided by K.C. Specifically, the jury was told (1) defendant disputed that the State had presented sufficient reliable evidence to establish beyond a reasonable doubt that he was the person who committed the alleged offense; (2) the State had the burden of proving the identification of defendant as the person who committed the offense beyond a reasonable doubt; (3) the jury had to critically analyze the identification testimony; (4) the jury needed to consider a number of factors, including (a) the witness' opportunity to "hear and degree of attention;" (b) the witness' level of stress; (c) the amount of time a witness had to perceive an event; (d) the distance between the witness and the alleged perpetrator; (e) the confidence in the witness' identification and the witness' level of certainty; and (f) the time lapse and the potential for memories to fade. The jury was also instructed that it was to consider whether the witness was exposed to opinions, descriptions, or identifications given by

8                                                    A-0819-15T2

other witnesses, or to any other information or influence that may have affected the independence of the witness' identification.

On appeal, defendant contends that the trial court failed to properly instruct the jury on how to evaluate a voice identification. Thus, defendant argues that the trial court should have provided specific instructions on how the jury should analyze a voice identification and how such an identification differs from an eyewitness identification.

Defendant did not object to the jury instructions at trial. Accordingly, we review the instructions for plain error to determine whether the alleged error had the capacity to lead to an unjust result. R. 2:10-2. In making this evaluation, we focus on the importance of jury instructions and recognize that erroneous jury charges on a matter "'fundamental and essential or . . . substantially material' [are] almost always considered prejudicial." State v. Maloney, 216 N.J. 91, 104-05 (2013) (quoting State v. Green, 86 N.J. 281, 291 (1981)).

When the error is fundamental, there is a presumption of reversible error "that can only be excused if the error is determined to be 'harmless beyond a reasonable doubt.'" Id. at 105 (quoting State v. Collier, 90 N.J. 117, 123 (1982)). An alleged error must be considered "in light of 'the totality of the entire charge.'" State v. Burns, 192 N.J. 312, 341 (2007) (quoting

State v. Chapland, 187 N.J. 275, 289 (2006)).  Moreover, the failure to "interpose a timely objection constitutes strong evidence that the error belatedly raised . . . was actually of no moment."  State v. White, 326 N.J. Super. 304, 315 (App. Div. 1999), certif. denied, 163 N.J. 397 (2000).

Here, we find no error in the jury instructions and, in particular, we find no plain error.  The instructions conveyed that K.C.'s identification of defendant was an essential issue in this case.  The jury was instructed on how to consider and evaluate the voice identification provided by K.C.  The instructions advised the jury that the identification testimony must be critically analyzed and provided the factors that should be used in that analysis.  The focus of the trial court's identification instructions related to the reliability of the identification made by K.C.  See Henderson, supra, 208 N.J. at 291-92.

C.   The Absence of a Hampton/Kociolek Charge

Defendant also argues that the trial court committed plain error by not sua sponte giving a charge concerning K.C.'s testimony that she recalled defendant stating, "I'm gonna be here every day til you get my dog back."  Accordingly, defendant argues that the trial court should have provided a charge concerning a witness' testimony regarding statements made by defendant, see State v. Kociolek, 23 N.J. 400, 421 (1957), and a charge concerning

10

defendant's oral statements, see State v. Hampton, 61 N.J. 250, 272 (1972).

Having reviewed the jury charges in light of defendant's arguments, we find no plain error. At trial, defendant focused his defense on contending that he was not present and did not commit the assault. Consequently, defendant was contending that someone else made the statement heard by K.C. The jury instructions clearly set forth defendant's contentions and how the jury should evaluate those contentions. Accordingly, the trial court did not commit plain error in not sua sponte giving Hampton and Kociolek charges.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-0819-15T2