**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2708-21

STATE OF NEW JERSEY,

 Plaintiff-Respondent,

v.

ANDREW PENA,

 Defendant-Appellant.

_____

> Argued November 28, 2023 – Decided February 7, 2025
>
> Before Judges Gooden Brown and Puglisi.
>
> On appeal from the Superior Court of New Jersey, Law Division, Morris County, Indictment No. 16-04-0298.
>
> Brian P. Keenan, Assistant Deputy Public Defender, argued the cause for appellant (Joseph E. Krakora, Public Defender, attorney; Brian P. Keenan, of counsel and on the brief).
>
> Robert J. Lombardo, Assistant Prosecutor, argued the cause for respondent (Robert J. Carroll, Morris County Prosecutor, attorney; Paula Jordao, Assistant Prosecutor, on the brief).

The opinion of the court was delivered by

GOODEN BROWN, J.A.D.

Following a 2021 jury trial, defendant was convicted of fourth-degree obstruction, third-degree corrupting or influencing a jury, and related conspiracy charges.  He

 was sentenced to an aggregate term of five years' imprisonment, with a two-year period of parole ineligibility, to run consecutive to a twenty-nine-year sentence defendant was already serving on a 2015 aggravated sexual assault conviction.  The obstruction-related charges stemmed from defendant conspiring with a friend to copy documents that had been excluded from his then-ongoing 2015 aggravated sexual assault trial and place them on cars parked in a garage used by jurors and court staff.

The friend later gave a Mirandized[1] statement to police and pleaded guilty to obstruction.  In his statement, the friend confessed to his involvement in the scheme but denied that defendant had directed him to target jurors specifically. Unfortunately, the friend died in 2018, before defendant was tried on the obstruction-related charges.  At trial, defendant, who represented himself with standby counsel, testified on his own behalf and denied targeting jurors in the

---

[1]  Miranda v. Arizona, 384 U.S. 436 (1966).

A-2708-21

document distribution scheme. However, during deliberations and delivery of the verdict, defendant was hospitalized due to injuries sustained from a fall in the courthouse and was unable to return to court.

On appeal, defendant raises the following points for our consideration:

POINT I

THE TRIAL COURT'S DECISION TO EXCLUDE THE DECEASED CO-DEFENDANT'S EXCULPATORY STATEMENT TO THE POLICE DENIED [DEFENDANT] HIS RIGHT TO PRESENT A DEFENSE.

    A.    The Co-defendant's Statement to the Police was Admissible as a Statement Against Interest Pursuant to N.J.R.E. 803(c)(25).

    B.    The Co-defendant's Statement was also Admissible Because he is Deceased, and the Recorded Statement was the Product of a Police Interview in Compliance with <u>Miranda</u> that was the Functional Equivalent of a Deposition where the State had the Opportunity and Same Motive to Elicit Incriminating Evidence, N.J.R.E. 804(b)(1)(A).

. . . .

POINT II

THE TRIAL COURT ERRED IN PROVIDING A HOPELESSLY CONFUSING WRITTEN AND ORAL JURY TAMPERING INSTRUCTION THAT INCLUDED EVERY ALTERNATIVE CHARGE,

3

AND FAILED TO DIFFERENTIATE THE ELEMENTS REQUIRED TO FIND ATTEMPT IN BOTH THE WRITTEN AND VERBAL INSTRUCTION. (NOT RAISED BELOW).

POINT III

THE TRIAL COURT ERRED BY CONTINUING DELIBERATIONS IN THE ABSENCE OF PRO SE DEFENDANT . . . WITHOUT A VALID WAIVER OF HIS RIGHT TO COUNSEL AT THAT CRITICAL STAGE, WHEN STANDBY COUNSEL REFUSED TO STEP IN AT [DEFENDANT'S] REQUEST. (NOT RAISED BELOW).

POINT IV

THE SENTENCING COURT ERRED IN FAILING TO AWARD JAIL AND GAP TIME CREDITS, IMPOSED A MANIFESTLY EXCESSIVE SENTENCE, AND DID NOT ISSUE THE REQUIRED EXPLICIT STATEMENT AS TO THE FAIRNESS OF A CONSECUTIVE SENTENCE UNDER THE CIRCUMSTANCES.

Based on our review of the record and the applicable legal principles, we affirm defendant's convictions but remand for further sentencing proceedings consistent with State v. Torres, 246 N.J. 246 (2021).

I.

We glean these facts from the trial record. On November 4, 2015, Lieutenant Michael Turkot of the Morris County Sheriff's Office (MCSO) was leaving his shift at the Morris County Courthouse when he discovered "some

4

papers in the driver's side door handle" of his "personal vehicle." Turkot's vehicle was parked in a parking garage that was about "[t]wo minutes" away from the courthouse by foot. Upon inspecting the papers, Turkot identified them as "several pages of unredacted police reports from both the Morris County Prosecutor's Office [(MCPO)] and the Butler Police Department."

The documents, which were admitted into evidence, consisted of three pages of police reports related to defendant's trial that was then underway at the Morris County Courthouse (the 2015 trial).[2] The reports stated that the victim and the only eyewitness identified the assailant as "a [B]lack male." At the bottom of the last page, a handwritten addition stated that "[t]he prosecutor who tried the case [was] . . . [defendant's] neighbor, so she should of [sic] stepped down, conflict of interest." The handwritten notation identified the prosecutor by name.

---

[2] The 2015 trial was defendant's second trial on charges stemming from a 2007 aggravated sexual assault. See State v. Pena, No. A-2098-15 (App. Div. Apr. 24, 2018) (slip op. at 2-4). The 2015 trial was conducted between October 19 and November 10, 2015. Id. at 3. Defendant represented himself in the 2015 trial and was ultimately convicted on November 10, 2015. Id. at 3, 9. During the obstruction trial that is the subject of this appeal, defendant admitted during his testimony that he was previously convicted of first- and second-degree offenses on November 10, 2015, and sentenced to an aggregate twenty-nine-year prison term for those offenses. Other than defendant's reference to the charges as "assault[]" charges during his testimony, the specific nature of the offenses was never revealed to the jury.

Turkot recognized the reports as "related to" an ongoing proceeding, namely, the 2015 trial, and "brought them to the [p]rosecutor's [o]ffice" so that they could be "return[ed] . . . to their originating . . . agency." After Turkot returned the documents, the MCPO initiated an investigation by sending several officers to the parking garage to "be[gin] . . . a systematic search of the vehicles" parked there. Officers ultimately found eight additional vehicles in the parking garage with copies of the same documents in their driver's side door handles.

The following day, November 5, the MCPO began reviewing security camera footage from the courthouse in an attempt to identify the individual who had distributed the documents. As part of the investigation, MCSO Sergeant Anthony Casale obtained surveillance footage showing "a white male" with a "bald head, a little bit of a goatee, . . . black tee shirt, . . . jeans and . . . black or dark-colored sneakers" entering the courthouse. Casale testified that although he did not know the individual's name at the time he reviewed the footage, he had been on duty in defendant's courtroom at the 2015 trial on November 4 and recognized the individual as a member of the public who had attended defendant's trial that day. There was also footage of an individual matching that description entering the garage where the documents were found and leaving the garage shortly thereafter.

6

The MCSO later identified the individual as Michael Campbell and confirmed his identity as a suspect from a fingerprint match found on one of the documents before turning the information over to the MCPO. Following the identification, MCPO officers proceeded to Campbell's home and placed him under arrest based on an outstanding traffic warrant. Following an interview,[3] officers transported Campbell back home, where Campbell gave them three documents defendant had mailed to him from the Morris County Correctional Facility. Two of these documents were the same three pages of police reports retrieved from cars parked in the courthouse garage. The third was a letter that defendant had handwritten to Campbell titled, "Evidence The Judge And The Prosecutor Does [sic] Not Want You To See. [Defendant] Is A White Male, Not Black." The letter summarized the contents of the documents and directed Campbell to "word it however [he] like[d]."

---

[3] While at the MCPO, Campbell was administered Miranda warnings and gave a statement that was excluded at the trial as inadmissible hearsay. In his statement, Campbell admitted distributing the documents at defendant's request, but denied receiving "specific instructions" as to "where to put [the documents] or who to give them to." He further explained that defendant had mailed the documents to him from jail a few weeks earlier. Campbell, who was initially charged as a co-defendant and pleaded guilty to obstruction, died on May 4, 2018, while awaiting sentencing.

In the course of the investigation, MCPO Sergeant Michael Puskas reviewed fourteen of defendant's phone calls at the Morris County Correctional Facility, four of which were played for the jury. The four selected phone calls occurred between defendant and Campbell on October 16, October 23, October 30, and November 2, 2015. In the October 16 call, defendant updated Campbell on the status of the 2015 trial. Defendant then asked Campbell about some "reports" and whether Campbell had had a chance to make copies. When Campbell said he had not, defendant told Campbell that he "wanted to tell [Campbell] something before [Campbell] made [the copies]."

In the October 23 call, defendant informed Campbell that opening statements would take place on Monday, October 26, and that trial was "off on Fridays." Defendant again inquired about "th[e] documents," specifically, whether Campbell thought he would "be able to distribute any of those." Campbell answered in the negative, reminding defendant that "[defendant had] told [Campbell] that [he] wanted to talk to [him] about it" and "not to do nothing [sic] yet." Defendant told Campbell that "there[ was] a [c]ourt [o]rder trying to keep this stuff out of there," and asked Campbell to "make a couple of copies while the trial [was] going on" and "put it in a couple of . . . vehicles in the area."

A-2708-21

Defendant confirmed that he was "giving [Campbell] the go ahead," but urged Campbell to "be discreet about it."

Defendant also directed Campbell to "put . . . something on there in regards [to] withholding . . . DNA evidence and [defendant's] relationship with the [p]rosecutor who handled the case," as well as defendant's belief that "the State [was] trying not to let anybody know about th[ose] facts." Defendant identified the prosecutor by name, spelling the name for Campbell.[4]

Defendant further instructed Campbell to "start spreading those things out" at "[a]ny time after . . . Monday . . . or Tuesday." Defendant and Campbell agreed that "the main [target was] that . . . parking garage," and defendant reminded Campbell to "make sure [he] w[ore] a hat." Defendant directed Campbell to "post things out . . . between Tuesday and Wednesday," since "Thursday [was] . . . one of those days [the trial was] going to be off" due to "a holiday." Near the end of the call, after Campbell assured defendant he would attend the trial, defendant told Campbell to "take a look at the you know what" and "the individuals in the . . . so[-]and[-]so that's in there" so that Campbell

---

[4] The same prosecutor was identified in the documents retrieved from the cars parked in the courthouse garage.

would "know . . . where they're going." Defendant added he "[did not] want to discuss anything on the—you feel me?"

In the October 30 call, defendant again updated Campbell on the trial's progress, as Campbell had been unable to attend as promised. Afterwards, defendant asked Campbell "to hit any of those parking lots with those reports" at "any time next week," because "it[ was] very important that . . . the parking lots get hit in a couple of the areas in . . . two or three days." Defendant suggested that Campbell ask others to "help . . . dump off as many as possible, especially in that parking lot." Campbell promised defendant that he would distribute the documents "when [he] c[ame] . . . to see [defendant] in court," and, at defendant's suggestion, assured defendant that he would "put [the documents] in the door handle so they have to grab it." When defendant reminded Campbell of the target areas, Campbell suggested that he "might even hand it [out to] a few people" and "give them a little brief" about "what it[ was] for," with both men agreeing that "[f]reedom of speech" would protect them.

The last call occurred on November 2, which was the Monday before the discovery of the documents in the parking garage on Wednesday, November 4. In that call, Campbell apologized for not being able to attend the trial yet but promised that he would "be able to make it over . . . [on] Wednesday."

Defendant dismissed Campbell's apologies, explaining that he was "not worried about [Campbell] . . . showing up to court," as his "whole thing [was] . . . . to get that done."

Defendant further informed Campbell that his trial was going badly because the judge "d[id not] want to allow . . . the jury to see those things that [he and Campbell] were talking about." As such, defendant stressed to Campbell that "it[ was] critical that [Campbell] bombard those things, any[ ]time after two o'clock" because he "want[ed] them to have it . . . right[] when they're leaving." To that end, defendant expressly directed Campbell to "[b]ombard that whole area," including "the stores" and "the deli . . . where everybody goes." Campbell promised that he was "definitely going to do that Wednesday." At the end of the call, defendant reminded Campbell to begin distributing "after two o'clock" to avoid being "intercepted," to "burn as many copies as" possible, and to "fold them nice . . . and tuck them."

During his trial testimony, defendant acknowledged that he had "used individuals" to expose evidence "that was never introduced during [the 2015 trial] proceedings" that ultimately led to his conviction. However, defendant claimed that he never targeted "jurors or witnesses." Instead, defendant targeted "investigative journalists [and] bloggers" as well as his former employees.

11

Defendant claimed that he was "a major infrastructure developer" and "master carpenter by trade." He explained that he wanted to disseminate the information because he "had a number of employees that were African Americans who felt offended" by defendant's seemingly baseless accusation of a Black man as the true perpetrator of the "assault[]" for which he was on trial. Defendant further asserted that inasmuch as "th[e reports] would have shown that" he was innocent of the charges, he "was not breaking the law" by distributing them, but rather "exercising [his] First Amendment[ r]ights."

Defendant acknowledged that Campbell was a "good friend" whom he had met in the county jail. According to defendant, Campbell "was in the county [jail], not for a violent crime," but because he was in arrears on his child support obligations. Defendant further confirmed that it was his voice in the recorded phone conversations, that he had spoken with Campbell "about some documents," and that he had "told . . . Campbell [he] didn't want those documents spread around on a weekend" or "on Election Day when the [c]ourts [were] closed." Defendant explained that Campbell "wanted to help [him]" correct the erroneous evidentiary rulings the judge had made in the 2015 trial, but died before he could testify for defendant. Nonetheless, defendant referred to Campbell's sworn statement during his own testimony, in which Campbell

12

had said that the document distribution campaign "had nothing to do with the jury and witnesses."

Defendant also presented testimony from Gregory Deal, who, in 2015, was the field manager at the Morristown Parking Authority and was responsible for providing the surveillance footage in the investigation. Deal testified that there was no "designated area for jurors" in the parking garage, nor was there a "designated area for [g]rand [j]urors."

Defendant was charged in a four-count indictment with fourth-degree obstructing the administration of law, N.J.S.A. 2C:29-1(a) (count one); fourth-degree conspiracy to commit obstruction, N.J.S.A. 2C:5-2(a)(1) and N.J.S.A. 2C:29-1(a) (count two); third-degree corrupting or influencing a jury, N.J.S.A. 2C:29-8(c) (count three); and third-degree conspiracy to corrupt or influence a jury, N.J.S.A. 2C:5-2(a)(1) and N.J.S.A. 2C:29-8(c) (count four). After a five-day trial, spanning December 9 to December 16, 2021, the jury returned a verdict of guilty on all counts.

Defendant was sentenced to an aggregate five-year term, with a two-year period of parole ineligibility, on counts one and three, which was to run consecutive to the twenty-nine-year term he was serving on his aggravated sexual assault conviction. Counts two and four were merged into counts one

and three, respectively. A conforming judgment of conviction was entered on March 31, 2022, and this appeal followed.

## II.

In Point I, defendant argues the trial judge erred in excluding Campbell's Mirandized statement to police on the ground that it was inadmissible hearsay because the statement "was clearly exculpatory" and its exclusion deprived defendant of his right "to present a defense." Defendant asserts that in the statement, Campbell admitted to his involvement in the scheme but "repeatedly denied that [defendant] ever explicitly instructed him to try to get the police reports to jurors during his prior trial, or that the purpose in distributing the reports was to influence the jury." As such, defendant contends Campbell's statement "was admissible both as a statement against interest[] pursuant to N.J.R.E. 803(c)(25)" and "as the functional equivalent of a deposition" "pursuant to N.J.R.E. 804(b)(1)(A)."

"[A] trial court's evidentiary rulings are entitled to deference absent a showing of an abuse of discretion, i.e., there has been a clear error of judgment." State v. Singh, 245 N.J. 1, 12-13 (2021) (alteration in original) (quoting State v. Nantambu, 221 N.J. 390, 402 (2015)). Under that standard, we "do not reverse the ruling of the trial court unless it 'was so wide of the mark that a manifest

denial of justice resulted.'" State v. Sanchez, 247 N.J. 450, 465-66 (2021) (quoting Singh, 245 N.J. at 13).

"Hearsay is 'a statement that: (1) the declarant does not make while testifying at the current trial or hearing; and (2) a party offers in evidence to prove the truth of the matter asserted in the statement.'" State v. Williamson, 246 N.J. 185, 199 (2021) (quoting N.J.R.E. 801(c)). "Hearsay is generally inadmissible unless an exception applies." Ibid.; N.J.R.E. 802. Here, it is undisputed that Campbell's Mirandized statement constitutes hearsay and that Campbell is an unavailable declarant.

The right to present a complete defense "is limited and subject to 'the application of evidentiary rules that themselves serve the interests of fairness and reliability—even if the defendant would prefer to see that evidence admitted.'" State v. Rosales, 202 N.J. 549, 562 (2010) (quoting Crane v. Kentucky, 476 U.S. 683, 690 (1986)). "Hearsay evidence is not admissible at trial because it is considered untrustworthy and unreliable." State v. Nevius, 426 N.J. Super. 379, 393 (App. Div. 2012). Notwithstanding the general proscription against hearsay evidence, "some exceptions to the hearsay rule have been made on the basis that 'the circumstances under which the statements were

made provide strong indicia of reliability.'" Ibid. (quoting State v. Phelps, 96 N.J. 500, 508 (1984)).

One such exception to the rule against hearsay is testimony given by an unavailable declarant in a prior proceeding pursuant to N.J.R.E. 804(b)(1)(A).

> Subject to the notice requirements of N.J.R.E. 807, N.J.R.E. 804(b)(1)(A) authorizes the admission of an unavailable declarant's testimony from a prior proceeding if the testimony
>
> (i) was given by a witness at a prior trial of the same or a different matter, or in a hearing or deposition taken in compliance with law in the same or another proceeding; and (ii) is now offered against a party who had an opportunity and similar motive in the prior trial, hearing or deposition to develop the testimony by examination or cross-examination.
>
> [State v. Sims, 250 N.J. 189, 219 (2022) (quoting N.J.R.E. 804(b)(1)(A)).]

Defendant argues that Campbell's Mirandized statement "carries an equivalent level of reliability as that given at a deposition," and thus "should be treated as the functional equivalent . . . under N.J.R.E. 804(b)(1)(A)." "[Courts] interpret an evidence rule, as [they] would a statute, by first looking at its plain language." State v. Rinker, 446 N.J. Super. 347, 362 (App. Div. 2016) (quoting State ex rel. J.A., 195 N.J. 324, 338 (2008)). We reject defendant's interpretation

16

as it contravenes the plain language of the rule. The rule requires that a statement be given as testimony "at a prior trial," "in a hearing," or in a "deposition taken in compliance with law." N.J.R.E. 804(b)(1)(A). A police interview, as defendant concedes, does not fit into any of those categories.

Turning to N.J.R.E. 803(c)(25), "[i]n both civil and criminal cases, N.J.R.E. 803(c)(25) prescribes an exception to the hearsay rule for certain statements that, when made, were against the declarant's interest." Rowe v. Bell & Gosset Co., 239 N.J. 531, 557 (2019). Under the rule, a hearsay statement may be admissible if it "so far tended to subject [the] declarant to civil or criminal liability . . . that a reasonable person in [the] declarant's position would not have made the statement unless the person believed it to be true." N.J.R.E. 803(c)(25).[5] The exception is premised on "the theory that, by human nature, individuals will neither assert, concede, nor admit to facts that would affect them unfavorably," making such statements "inherently trustworthy and reliable." Rowe, 239 N.J. at 558 (quoting State v. Brown, 170 N.J. 138, 148-49 (2001)).

---

[5] The hearsay exception for statements against interest was relocated to N.J.R.E. 804(b)(3) effective July 1, 2024, and now requires declarants to be unavailable for their statements to be admissible under the exception. Sup. Ct. of N.J., Notice to the Bar: Amendments to New Jersey Rules of Evidence 803(c)(25) and 804(b)(3) (July 1, 2024). We use the rule designation that applied at the time of defendant's trial. N.J.R.E. 803(c)(25) (2020).

"The test for the admissibility of a statement under N.J.R.E. 803(c)(25) is 'whether, in the context of the whole statement, the particular remark was plausibly against the declarant's penal interest, even though it might be neutral or even self-serving if considered alone.'" State v. Hannah, 248 N.J. 148, 183-84 (2021) (quoting Rowe, 239 N.J. at 558-59). "The statement, however, must on the whole be so far against the declarant's interest that a reasonable person in the declarant's position would not have made the statement unless [the declarant] believed it to have been true." Nevius, 426 N.J. Super. at 394 (citing State v. White, 158 N.J. 230, 238 (1999)).

Moreover, though "[t]he rule does not require that each discrete part of the statement imply involvement in a crime," Hannah, 248 N.J. at 184 (quoting State v. Abrams, 140 N.J. Super. 232, 235 (App. Div. 1976)), "the statement must have been against the declarant's interest at the time it was made," Brown, 170 N.J. at 149, and the declarant must be aware that their statements may subject them to criminal prosecution or penalties, State v. McGuire, 419 N.J. Super. 88, 138 (App. Div. 2011). "Whether a statement is in fact against the declarant's interest must be determined from the circumstances of each case." Ibid.

Stated differently,

> [a] statement against interest is clearly admissible "if the declarant has admitted [being] involve[d] in the crime either directly, or indirectly." White, 158 N.J. at 244-45 (citations omitted). It is admissible also "if it exculpates a defendant," provided that the statement is against the "penal interest" of the declarant. Id. at 244 (quoting Report of the New Jersey Supreme Court Committee on Evidence (Mar. 1963)).
>
> [Hannah, 248 N.J. at 184 (citation reformatted).]

In his November 5, 2015, Mirandized statement, Campbell readily confirmed that the day before, November 4, he "went around and handed out a police report" in connection with an ongoing trial by "put[ting] it in doorknobs of cars" in "the parking garage across the street from the courthouse." When asked why he had done it, Campbell asked the detectives if the police report was "public record" and whether "anybody [could] go on the computer and get [it]." The detectives answered in the negative and repeated the question.

Campbell responded:

> I see I made a mistake, okay? I could be 100 percent honest with you guys right now and tell you why I did what I did, you know what I'm saying. I can do that, all right? Listen, I thought I was helping somebody out. I thought I was doing something that I couldn't get in trouble for. I didn't know that I could get in trouble for this. I really thought that this was public record and me making a few copies of it and sticking it around so people see what the police report said when you know

19

maybe this isn't allowed, I don't know, maybe if people seen this, the dude wouldn't be getting in trouble right now.

Upon questioning, Campbell identified defendant as the person he was helping and explained that they became friends when they were both confined at the county jail. Campbell told the detectives that defendant mailed the report to him "a couple weeks" earlier and asked Campbell to "make some copies of th[e report] and write a little something in there so that people knew" of the "illegal stuff that went on in" defendant's sexual assault trial. Campbell described the illegalities as the fact that the prosecutor who tried the case "was [defendant's] neighbor," thereby creating "a conflict of interest," and the fact that the police report that was excluded should have been admitted at the trial.

According to Campbell, defendant asked him if he "could maybe get a couple of copies and put them around." Campbell denied receiving any compensation or instructions from defendant regarding "where to put [the reports] or who to give them to," and specifically denied that defendant "wanted [him] to hand [the reports] out around the courthouse." Campbell explained that defendant had only told him to "hand [the reports] around in general, . . . everywhere," so that "people [would] know what[ was] going on." Campbell stated that he chose the parking garage because he "want[ed] . . . people [to] see

them," and he knew that the "parking garage [was] for the courthouse . . . and the business[es] around there." Campbell also said that he "only had enough money to make [ten] copies" of the report, so he "figured [he] would just put [the reports] in the car[s]" to maximize the possibility that people would "grab [the report] and sit down with it."

When the detectives pressed Campbell about defendant's intent in asking Campbell to distribute the reports, Campbell again denied receiving "specific instruction[s]" from defendant, and stressed that defendant "just said [to] make copies and hand them out." Upon further questioning, Campbell speculated that defendant may have asked him to distribute the reports hoping that they would "come[] back into the court" or "for the jury to be able to see [them]." However, Campbell maintained that defendant "never said that to [him]."

When the detectives informed Campbell that he "could be charged with obstruction or corrupting a jury," Campbell acknowledged that defendant "knew that [Campbell] was going to put [the reports] in the parking garage" and had expressed approval of that plan. He further confirmed that he distributed the reports "[b]etween [12:00 p.m.] and 12:30 [p.m.]" after he left the courtroom. However, Campbell insisted that "all [defendant] asked [him] to do was hand

21

them out," and that defendant "didn't say where to hand them out or anything like that."

Furthermore, Campbell denied "looking for . . . any kind of Morris County decal or . . . identifier" when distributing the reports. Instead, he stated that he chose cars "randomly" and distributed the reports quickly. He also denied that defendant told him to "approach" the prosecutor named in the handwritten portion of the documents, or that defendant "asked [him] to approach anybody" at all. Campbell agreed to turn over the letter defendant had sent him with the reports, reiterating that if he had known that "[he] could get in trouble for doing something like this," he would never have done it.

During the trial, defendant sought to introduce Campbell's statement to prove that defendant did not direct him to target jurors. The State objected on the ground that the statement was hearsay and there was no applicable hearsay exception. The judge agreed with the State and ruled that because Campbell was "not subject to cross-examination," the "prior statement would not be admissible under the circumstances." We are satisfied that, in its entirety, the statement was not against Campbell's penal interest sufficient to satisfy N.J.R.E. 803(c)(25). Thus, the judge did not err in excluding it.

Defendant argues that Campbell's statement was inculpatory because he "admitted that he agreed with [defendant] to distribute the police reports" and that "it was his idea to distribute them in the parking lot across from the courthouse." However, neither admission was against Campbell's penal interest. First, Campbell was not aware of any potential criminal liability when he initially made the disclosures. See McGuire, 419 N.J. Super. at 138 (affirming exclusion of allegedly incriminating hearsay statement where there was no evidence that the declarant knew the statement might subject him to criminal prosecution). Second, the admissions alone did not subject Campbell to criminal liability because he denied targeting the jury. See State v. Gomez, 246 N.J. Super. 209, 216 (App. Div. 1991) (holding that a defendant's admission of keeping a gun in his apartment despite not having a firearms permit was not inculpatory in murder prosecution because doing so was not a crime under N.J.S.A. 2C:39-5(b)).

Moreover, "[e]xamination of the statement in its entirety reveals a clear design . . . to exonerate [the declarant] from criminal exposure." Ibid. Although Campbell speculated that defendant's intent in asking him to distribute the reports was to influence the outcome of the 2015 trial, Campbell consistently distinguished that from his own intention, which he maintained was simply "to

do a favor" for a friend. "[T]hese statements, considered either individually or collectively, are inherently self-serving and obviously tainted by the motive to exculpate [Campbell] from liability for the . . . charge he was possibly facing." Nevius, 426 N.J. Super. at 394. But see Abrams, 140 N.J. Super. at 236 ("Evidence that [a remark] was possibly tainted by an impure motive appropriately bears only on its value.").

Under these circumstances, Campbell's statements were not "so far against [his] interests 'that a reasonable person in [his] position would not have made the statement unless [he] believed it to be true.'" State v. Norman, 151 N.J. 5, 31 (1997) (quoting N.J.R.E. 803(c)(25) (2020)). But see State v. Weaver, 219 N.J. 131, 158-59 (2014) ("We know of no rule that eviscerates the character of a statement against penal interest and denies admission of the statement because it is a mixture of exculpatory and incriminatory statements."). Nonetheless, even if exclusion of the statement was erroneous, we are satisfied that the judge's ruling was harmless.

To determine whether an evidentiary ruling constitutes harmless error, "the relevant inquiry is whether the purported error 'is of such a nature as to have been clearly capable of producing an unjust result.'" State v. Hedgespeth, 249 N.J. 234, 252 (2021) (quoting State v. Kuchera, 198 N.J. 482, 501 (2009)).

Under that standard, there must "be 'some degree of possibility that [the error] led to an unjust result.'" State v. Ingram, 196 N.J. 23, 49 (2008) (alteration in original) (quoting State v. R.B., 183 N.J. 308, 330 (2005)). "The possibility must be real, one sufficient to raise a reasonable doubt as to whether [it] led the jury to a verdict it otherwise might not have reached." R.B., 183 N.J. at 330 (alteration in original) (quoting State v. Bankston, 63 N.J. 263, 273 (1973)).

Here, we are satisfied the purported error did not lead to an unjust result. The crucial evidence presented by the State at trial was the four recorded phone calls between defendant and Campbell, during which the document distribution scheme was concocted and discussed. Through those calls, which provided substantial support for defendant's convictions, the jurors were able to discern for themselves defendant's plan and intent in distributing the documents. Thus, even if the statement was excluded in error, we are convinced based on the strength of the State's case that the error was harmless.

### III.

In Point II, defendant argues for the first time on appeal that the judge's jury instructions were flawed. According to defendant, although the judge "followed the model charge, . . . [he] did so mechanically." As a result, defendant contends the judge failed to limit the instructions on count three,

which charged defendant with third-degree corrupting or influencing a jury, N.J.S.A. 2C:29-8, to the portions "applicable to the State's theory and evidence presented." Instead, defendant asserts the judge erroneously included "instructions on the completed versions of the offense," notwithstanding the fact that "the State's theory was . . . attempt."

The governing legal principles that guide our analysis are well settled. "Appropriate and proper charges to a jury are essential for a fair trial." State v. Lora, 465 N.J. Super. 477, 501 (App. Div. 2020) (quoting State v. Green, 86 N.J. 281, 287 (1981)). "Jury charges must provide a 'comprehensible explanation of the questions that the jury must determine, including the law of the case applicable to the facts that the jury may find.'" State v. Singleton, 211 N.J. 157, 181-82 (2012) (quoting Green, 86 N.J. at 287-88).

If a defendant does not object when a charge is given, as here, "there is a presumption that the charge was not error and was unlikely to prejudice the defendant's case." State v. Montalvo, 229 N.J. 300, 320 (2017) (quoting Singleton, 211 N.J. at 182). When there is no objection, we review for plain error and "disregard any alleged error 'unless it is of such a nature as to have been clearly capable of producing an unjust result.'" State v. Funderburg, 225 N.J. 66, 79 (2016) (quoting R. 2:10-2); see State v. Adams, 194 N.J. 186, 206-

07 (2008) ("Generally, a defendant waives the right to contest an instruction on appeal if [the defendant] does not object to the instructions as required by Rule 1:7-2.").

Plain error in a jury charge is "[l]egal impropriety in the charge prejudicially affecting the substantial rights of the defendant [and] sufficiently grievous to justify notice by the reviewing court and to convince the court that of itself the error possessed a clear capacity to bring about an unjust result." State v. Camacho, 218 N.J. 533, 554 (2014) (first alteration in original) (quoting Adams, 194 N.J. at 207). "Nevertheless, because clear and correct jury instructions are fundamental to a fair trial, erroneous instructions in a criminal case are 'poor candidates for rehabilitation under the plain error theory.'" Adams, 194 N.J. at 207 (quoting State v. Jordan, 147 N.J. 409, 422-23 (1997)).

To determine whether there is reversible error in a jury charge, it is axiomatic that "[t]he charge must be read as a whole." State v. Torres, 183 N.J. 554, 564 (2005) (citing Jordan, 147 N.J. at 422). We "must not look at portions of the charge alleged to be erroneous in isolation; rather, 'the charge should be examined as a whole to determine its overall effect,' and 'whether the challenged language was misleading or ambiguous.'" State v. McKinney, 223 N.J. 475, 494 (2015) (citation omitted) (first quoting Jordan, 147 N.J. at 422; and then quoting

27

State v. Nelson, 173 N.J. 417, 447 (2002)).  In addition, the error "must be evaluated in light 'of the overall strength of the State's case.'"  State v. Walker, 203 N.J. 73, 90 (2010) (quoting State v. Chapland, 187 N.J. 275, 289 (2006)).

Although model jury charges "are not binding authority," State v. Bryant, 419 N.J. Super. 15, 28 (App. Div. 2011), "a jury charge is presumed to be proper when it tracks the model jury charge because the process to adopt model jury charges is 'comprehensive and thorough.'"  State v. Cotto, 471 N.J. Super. 489, 543 (App. Div. 2022) (quoting R.B., 183 N.J. at 325).  As such, "[i]n general, '[i]t is difficult to find that a charge that follows the [m]odel [c]harge . . . closely constitutes plain error.'"  State v. Berry, 254 N.J. 129, 145 (2023) (second alteration in original) (quoting State v. Ramirez, 246 N.J. 61, 70 (2021)); see also R.B., 183 N.J. at 325 (instructing trial courts to follow the model jury charges and read them "in their entirety to the jury").

Turning to the elements of the pertinent offense, N.J.S.A. 2C:29-8 provides in relevant part:

> Any person who, directly or indirectly, corrupts, influences or attempts to corrupt or influence a jury or juror to be more favorable to the one side than to the other by promises, persuasions, entreaties, threats, letters, money, entertainment or other sinister means; or any person who employs any unfair or fraudulent practice, art or contrivance to obtain a verdict, or attempts to instruct a jury or juror beforehand at any

place or time, or in any manner or way, except in open court at the trial of the cause, by the strength of the evidence, the arguments of the parties or their counsel, or the opinion or charge of the court is guilty of a crime.

Under certain circumstances not applicable here, corrupting or influencing a jury is a crime of the first or second degree if "the actor employs force or threat of force." N.J.S.A. 2C:29-8(a), (b). "Otherwise, corrupting or influencing a jury is a crime of the third degree . . . ." N.J.S.A. 2C:29-8(c).

Consistent with the statutory language, the model jury charge for the offense offers two definitions for a completed crime:

(1a) that the defendant, directly or indirectly, corrupted [or] influenced [or attempted to corrupt or influence] a jury or juror to be more favorable to one side than to the other by promises, persuasions, entreaties, threats, letters, money, entertainment or other sinister means;

(and/or)

(1b) that defendant employed any unfair or fraudulent practice, art or contrivance to obtain a verdict, [or attempted to instruct a jury or juror beforehand] at any place or time, or in any manner or way, except in open court during the course of the trial, by the strength of the evidence, the arguments of the parties or their counsel or the opinion or charge of the court; and

(2a) that defendant acted knowingly.

(and/or)

29

(2b) that defendant attempted to corrupt or influence the jury.

[Model Jury Charges (Criminal), "Corrupting or Influencing a Jury (N.J.S.A. 2C:29-8)," at 1-2 (rev. June 13, 2011).]

Because an attempt to corrupt a jury is sufficient to support guilt of the third-degree offense, the model charge sets forth two different instructions: Alternative I, which is "[t]o be used when [a] defendant is charged with Attempt," and Alternative II, which is used when a defendant is not charged with Attempt but "the facts raise the question [of] whether the crime was completed." Id. at 3. Alternative I instructs jurors that "[t]he second element that the State must prove beyond a reasonable doubt is that the defendant attempted to corrupt or influence a jury." Ibid. If Alternative II is charged, jurors are told that "[t]he second element that the State must prove beyond a reasonable doubt is that the defendant acted knowingly," and are instructed accordingly. Id. at 2-3. But, "[i]f the facts raise the question [of] whether the crime was completed," Alternative II directs the jury to "consider whether an attempt to commit the crime has been established." Id. at 3. The jury then receives instructions distinguishing between "knowledge" and "purpose," the different theories of attempt, and the elements of an attempt to commit corrupting or influencing a jury under each applicable theory. Id. at 3-9.

30

During the charge conference, relying on the model charge, the State proposed the removal of the terms "promises," "threats," "money," "entertainment," and "art" from both the statutory language and the definition of each element. The State also proposed the removal of the phrase "corrupted [or] influenced" from subsection 1a. However, those terms were retained throughout the remainder of the instructions. Additionally, the State proposed the removal of the word "and" throughout the model charge, so that the jurors would have to choose between the alternatives presented instead of "combin[ing] both charges." The parties further agreed that "Alternative II w[ould] be read." Defendant did not object to any of the proposed changes and the judge accepted all of the State's recommendations.

However, while reading the charge to the jury, the judge omitted several portions that the State had not deleted. For example, while instructing the jury on the different types of attempt, the judge omitted subsection two, which defines attempt "[w]hen [c]ausing a [p]articular [r]esult is an [e]lement of the [c]rime." Model Jury Charges (Criminal), "Corrupting or Influencing a Jury (N.J.S.A. 2C:29-8)," at 4. Nevertheless, the judge included the elements of that type of attempt alongside his instructions regarding the elements of subsections one and three, which set forth attempt by impossibility and substantial step,

respectively. The judge further omitted the instructions regarding renunciation of purpose.

The judge also included instructions that were seemingly inapplicable to the facts presented. Specifically, the judge included some, but not all, of the instructions pertaining to the first-degree offense, which requires the additional elements of use or threat of force in connection with an official proceeding involving enumerated crimes. N.J.S.A. 2C:29-8(a). The judge omitted the portions defining "use of force" and "threat of force" and listing the qualifying crimes but retained the portion defining "official proceeding."

Furthermore, the judge's oral instructions omitted the descriptive headings between the elements for each theory of attempt. The written copies of the instructions, provided to the jury pursuant to <u>Rule</u> 1:8-8(b)(2), were identical to those read by the judge, except that the written copy retained the descriptive headings for attempt by impossibility and by substantial step.[6] There were no objections to the charge by either party.

---

[6] Nevertheless, the judge instructed the jury not to "rely on the subheadings in the written instructions" as they did "not add to any explanation . . . given" and "their only purpose" was "to help . . . find the appropriate topics covered in the instructions."

A-2708-21

We acknowledge that there were several internal errors in both the judge's oral and written instructions on corrupting or influencing a jury that could have caused confusion to the jury. However, we are satisfied that under the circumstances, this is a case where the "jury instructions are not incorrect but merely capable of being improved." State v. Tierney, 356 N.J. Super. 468, 481 (App. Div. 2003).

First, the judge committed no error in instructing the jury in both types of conduct. Contrary to defendant's argument, subsection 1a of the model charge is not solely focused on the use of threats and inducements. See Model Jury Charges (Criminal), "Corrupting or Influencing a Jury (N.J.S.A. 2C:29-8)," at 1. Rather, the charge also includes "persuasions, entreaties, . . . letters," or "other sinister means," all of which was consistent with the State's theory that defendant and Campbell "wanted th[e] documents on cars so that he could get the word out about what he wanted the jurors to know." Consequently, the inclusion of both 1a and 1b "was consistent with the factual theories advanced by the parties," and therefore does not constitute plain error. State v. White, 326 N.J. Super. 304, 315 (App. Div. 1999).

Second, contrary to defendant's contention, the judge did not err by including "both the completed crime[] and attempt language." Alternative II,

which the parties agreed was appropriate, assumes the jury has been instructed on the completed crime. Model Jury Charges (Criminal), "Corrupting or Influencing a Jury (N.J.S.A. 2C:29-8)," at 3. Moreover, the record shows that the judge prefaced the instructions regarding attempt by distinguishing between the two, particularly the different states of mind applicable to each. Thus, the jury was specifically informed about the differences between the completed crime and attempt, undermining defendant's argument that including both "surely confused the jury." Critically, the jury did not ask for clarification regarding the charge, which also suggests that it was not confused by the inclusion of both instructions. State v. Docaj, 407 N.J. Super. 352, 365-66 (App. Div. 2009) (noting "whether any questions from the jury revealed a need for clarification" as one factor in reviewing an error in jury instructions).

Lastly, the inclusion of instructions regarding the elements of all three types of attempt does not rise to the level of plain error. Contrary to defendant's arguments, the evidence presented at trial could have supported a conviction under any one of those theories of attempt. At trial, the State presented evidence that defendant mailed the reports to Campbell from jail with instructions regarding what to write on them. Defendant's phone calls showed him formulating the plan with Campbell over the course of several weeks, speaking

in euphemism or otherwise avoiding discussion regarding the intended recipients on the phone, and urging Campbell to complete the distribution as soon as possible. The jury could reasonably have concluded that these actions constituted a substantial step toward corrupting or influencing the jury. See State v. Jones, 242 N.J. 156, 176 (2020) (explaining that a defendant satisfied the substantial step requirement where his "verbal demands" that others commit the crime "corroborated the firmness of his purpose to have the crime carried out").

The jury also heard defendant instruct Campbell to "take a look at [the] you know what" and "the individuals in the . . . so and so that's in there" so that Campbell would "know . . . where they're going." Based on that direction, the jury could have found that defendant reasonably believed Campbell would target the jurors in the 2015 trial, thus supporting an attempt by impossibility theory. See State v. Kuhn, 415 N.J. Super. 89, 100 (App. Div. 2010) (explaining that attempt by impossibility requires jury to find purpose and reasonable belief under the circumstances).

Defendant also told Campbell that the 2015 trial was going poorly since the judge "d[id not] want to allow . . . the jury to see" the police reports and, as a result, stressed that "it[ was] critical that [Campbell] bombard those things,

any[ ]time after two o'clock" because he "want[ed] them to have it . . . right[] when they're leaving."  From this evidence, the jury could have found that defendant's purpose in giving the directions was for Campbell to leave the documents in the door handles shortly before the jurors left the courthouse because defendant could not do so himself from prison.  See State v. Kornberger, 419 N.J. Super. 295, 302 (App. Div. 2011) (explaining that attempt under N.J.S.A. 2C:5-1(a)(2) concerns a nearly complete act that requires an additional step beyond the actor's control).

In other words, "[w]hile it would have been preferable had the judge more precisely related the facts to the law in his instructions, the charge given, as a whole, was consistent with the factual theories advanced by the parties."  White, 326 N.J. Super. at 315 (citations omitted).  Moreover, "[d]efendant's failure to submit a request to charge or interpose a timely objection constitutes strong evidence that the error belatedly raised here was actually of no moment."  Ibid.

## IV.

In Point III, defendant argues the judge erroneously "continue[d] deliberations and replace[d] a juror outside [his] presence" after defendant was hospitalized from injuries sustained in a fall.  Defendant asserts that given his medical condition at the time, his decision "to allow the trial to continue . . . was

36

not a valid waiver of his right to be present," particularly since he was representing himself and his standby counsel was not present as he had been assured.

"The right to be present at trial is protected by the Sixth Amendment to the United States Constitution as applied to the states through the Fourteenth Amendment, and by Article I, paragraph 10 of the New Jersey Constitution." State v. Dellisanti, 203 N.J. 444, 453 (2010) (citing United States v. Gagnon, 470 U.S. 522, 526 (1985)). The right includes "a criminal defendant's right to be present in the courtroom during every 'critical stage' of the trial," and is additionally protected by the Fourteenth Amendment's Due Process Clause "'to the extent that a defendant's absence would hinder a fair and just hearing.'" State v. Reevey, 417 N.J. Super. 134, 149 (App. Div. 2010) (first quoting State v. Zenquis, 251 N.J. Super. 358, 363 (App. Div. 1991); and then quoting State v. Finklea, 147 N.J. 211, 216 (1996)).

A defendant's right to be present attaches "whenever . . . [the defendant's] presence has a relation, reasonably substantial, to the fullness of [the defendant's] opportunity to defend against the charge." State v. A.R., 213 N.J. 542, 557-58 (2013) (quoting Dellisanti, 203 N.J. at 453). That said, presence at trial

> affords a defendant the ability to
> communicate with counsel during trial,
> [and to] assist in presentation of a defense[]
> and in the process of cross-examination. It
> includes the independent right of a
> defendant to represent himself or herself at
> all stages of a criminal proceeding, if he or
> she elects to do so. Institutionally, the
> defendant's right to be present at trial
> ensures public confidence in the courts as
> instruments of justice.
>
> [Dellisanti, 203 N.J. at 454 (quoting State v. Hudson,
> 119 N.J. 165, 172 (1990)).]

A criminal defendant's right to be present during trial is "so vital to the proper and fair functioning of the criminal justice system," ibid., that it is further protected by Rule 3:16, which provides that a defendant "must be present for every scheduled event unless excused by the court for good cause shown." R. 3:16(a). The rule also requires a defendant's presence "at every stage of the trial." R. 3:16(b). "Nothing in th[e rule], however, shall prevent a defendant from waiving the right to be present at trial." Ibid.

Indeed, pursuant to the rule,

> A waiver may be found either from (a) the defendant's
> express written or oral waiver placed on the record, or
> (b) the defendant's conduct evidencing a knowing,
> voluntary, and unjustified absence after (1) the
> defendant has received actual notice in court or has
> signed a written acknowledgment of the trial date, or
> (2) trial has commenced in defendant's presence.

38

[Ibid.]

"Although the right to be present at trial is a matter of constitutional imperative, that right is not absolute." State v. Whaley, 168 N.J 94, 100 (2001). On the contrary, "[t]he right of the accused to be present must be anchored to the reason for its existence," and "is not guaranteed 'when presence would be useless, or the benefit but a shadow.'" Zenquis, 251 N.J. Super. at 364 (quoting Snyder v. Massachusetts, 291 U.S. 97, 106-07 (1934), overruled on other grounds, Malloy v. Hogan, 378 U.S. 1, 6 (1964)). In line with that principle, our Supreme Court has held that the improper exclusion of a defendant from a trial proceeding "does not [automatically warrant reversal] and that each case is subject to a harmless error analysis." State v. W.A., 184 N.J. 45, 64 (2005). Where "[t]he traditional justifications underlying [a] defendant's right to be present, specifically the right to assist counsel in [defending the case], to assist in the cross-examination of witnesses, and to influence the jury psychologically by [being] presen[t], [are] absent," a defendant's presence is not constitutionally required. State v. Morton, 155 N.J. 383, 445 (1998) (citation omitted) (citing Hudson, 119 N.J. at 172). Nor is a defendant's presence required in proceedings "centered on questions of law." Ibid.

A-2708-21

Here, on December 14, 2021, the judge gave the jury the final instructions and it began deliberating. After deliberating for less than an hour, the jury sent a note to the judge asking to "hear the phone calls again." The jury also asked for "transcript[s]" of the "four calls." Because it was the end of the day, the judge discharged the jury for the day to further discuss the jury's requests with the parties. During the discussions, the prosecutor objected to providing the jury with a transcript, while defendant believed the jury should be given a transcript.

The following day, December 15, in the presence of the prosecutor and standby counsel, the judge placed on the record that after the court proceedings concluded the day before, defendant fell down the stairs while being escorted back to his holding cell and sustained injuries that required hospitalization. The judge advised that he had notified the jurors that there was a delay in the proceedings and that they should not report until 9:00 a.m. the next day, December 16. The judge also postponed any further proceedings with the parties for the day until he was able to ascertain the status of defendant's medical condition.

The following morning, December 16, outside the presence of the jury but in the presence of the prosecutor and standby counsel, defendant appeared virtually from his hospital bed. After defendant was sworn, the judge asked

defendant a series of questions to assess defendant's "condition" in light of the fall. To that end, the judge asked defendant about the medications defendant was taking, his injuries, and the treatment he had received to that point. Defendant responded that he was taking a number of medications, including OxyContin, and gave a detailed account of his injuries and his treatment. According to defendant, he had "received . . . a number of MRI[s]," and was "being transferred to another hospital" for "emergency" surgery. He stated that he had "no sensation from the waist down," "a torn rotator cuff in [his] right shoulder," "a blood clot in [his] eye," and the "loss of one tooth." Although defendant stated that he "d[id not] remember anything after the fall," he recalled that he was "still in the courthouse" when he fell and was transported to the hospital "by way of ambulance."

After discussing defendant's medical condition, the judge turned to substantive matters, beginning with the jury's request to hear the four phone calls that the parties had been discussing before defendant's fall. Defendant corrected the judge, accurately recalling that the jury had also requested transcripts of the calls in addition to the audio recordings, and reiterated his position that both the transcripts and the audio recordings should be given to the jury. Upon acknowledging that he would not be able to return to the courtroom because of

41

his injuries, defendant sought to reinstate standby counsel as his attorney of record.

In response to defendant's request, standby counsel stated:

> I will not stand in.  I am not the attorney of record.  I will not be the attorney of record. . . .  [I]f Your Honor orders me, . . . you're going to put me into a position where I am going to refuse the [c]ourt's order.  I'm telling you right now, I will not step into a case that I have not been the attorney of record and I have not tried before this jury.  I will not do it under any circumstances.
>
> . . . .
>
> I will sit where I have been sitting for the entire trial.  Counsel table is reserved for the attorneys. . . .  I will not sit at counsel table regardless of what [defendant] wants.  I am standby counsel and only standby counsel.  I am not going to get put into this case when the jurors are deliberating[.]  I don't know what their verdict is going to be.  I am not going to set myself up for some type of future proceedings where it's alleged[,] whether there's a basis or there's not a basis, that I did something or did not do something as counsel.

The judge retorted that he was not ordering standby counsel to appear as the attorney of record but to continue in his role as standby counsel.  In that regard, the judge and defendant had the following exchange:

> THE COURT:  All right.  As for the obligations of standby counsel, . . . the purpose of standby counsel is to assist . . . defendant. . . . Mr. Pena, you've heard the position of [standby counsel].  . . . I have options

42

that I can ask you, Mr. Pena, and it's certainly up to you on how you wish this [c]ourt to proceed. . . . [U]nder the circumstances, certainly you have the right to . . . waive your appearance at this time, . . . and I will . . . order the jurors not to consider your absence. I will order [standby counsel] to be in the courtroom . . . as he's been in the courtroom throughout the proceedings. . . . [Y]our thoughts regarding same, Mr. Pena?

[DEFENDANT]: Judge, there's no objection.

THE COURT: All right. And I will tell you, also, under the circumstances, any communications that we get from the jury . . . regarding questions, . . . I will . . . ensure that you are informed of the question, and I will await your response before I respond to any questions. Your thoughts regarding same, Mr. Pena?

[DEFENDANT]: . . . I agree with the position of the [c]ourt, Judge.

Following additional colloquy, defendant expressed his desire to "finish [the trial] out" and agreed to waive his right to be present. The judge accepted defendant's waiver, noting:

And I certainly note that you . . . have been communicative, you've certainly answered all of my questions. . . . I do note that, as you've stated, you're under medication, . . . but you've certainly been communicative. Frankly, your memory was . . . more accurate . . . than the [c]ourt's regarding the specifics of the note . . . and how to proceed.

. . . .

43

> For the record, I do find that . . . defendant has been responsive. He has answered all questions posed to him by the [c]ourt. He has certainly followed the direction of the [c]ourt. Quite candidly, I asked . . . defendant to show me his tooth . . . not, frankly, so that I c[ould] evaluate his dental . . . condition, but rather whether he was able to follow instructions . . . and orders of the [c]ourt, . . . and he certainly was able to do so and displayed his teeth . . . to the [c]ourt.
>
> . . . [H]e corrected the [c]ourt's misstatements regarding the specificity of the note. His memory, frankly, was . . . a hundred percent accurate . . . as to the note that was sent out [by] the jury.

The jury resumed deliberations later in the day and returned a guilty verdict in defendant's absence, but in the presence of standby counsel and the prosecutor.

Defendant now argues that his "request to have standby counsel present during his absence clearly show[ed] that he was not willing to waive his right to counsel." Furthermore, because the judge undertook "no inquiry . . . as to whether [defendant] was aware of what he would be giving up by agreeing to allow the trial to continue outside his presence," defendant contends that there is "no evidence that his waiver was knowing, intelligent and voluntary." Consequently, according to defendant, his "decision . . . to allow trial to continue outside his presence was not a valid waiver of his right to be present as the defendant or his right to counsel during this critical stage of the proceedings."

44

Based on our consideration of the record in its entirety, we are satisfied defendant voluntarily, knowingly, and intelligently waived his right to be present. Even if defendant's express waiver was inadequate, his conduct evidenced a knowing and voluntary absence. See R. 3:16(b).

In Dellisanti, our Supreme Court considered whether a defendant's constitutional right to be present was violated under similar circumstances. 203 N.J. at 449-50, 459-60. There, the defendant "was not in the courtroom when, during the jury's deliberations, the trial court responded to two questions posed by the jury and when the jury returned its verdict." Id. at 447. Defendant's "absence was due to a medical problem that resulted in his removal to a local hospital for attention." Id. at 448. "Defendant's counsel acquiesced to the trial court's brief explanation to the jury to that effect." Ibid. Although "[n]o further relief was requested during trial, and no motion for a new trial was made by defendant," on appeal, defendant raised "a deprivation of his right to be present at his trial." Ibid.

The Court concluded that the defendant effectively waived his right to be present and declined to reverse the defendant's convictions because "counsel's agreement to the trial court's procedure and to the court's explanation to the jury sufficed to demonstrate to the trial court, and now to us, that at the time [the]

defendant was acquiescing to his absence from the closing events of his trial."

Id. at 461. Additionally, the Court cited "[the d]efendant's failure to advance any post-trial motion in that regard" as "further evidence" in support of its conclusion. Ibid.

Lastly, the Court held that

> defendant has demonstrated no prejudice from his lack of participation in the court's response to the brief, simple factual questions posed by the jury. And, we further discern no per se, or otherwise demonstrable, prejudice to defendant from his apparent acquiescence to his absence from the return of the jury's verdict. Therefore, we reject defendant's argument that he is entitled to reversal of his conviction based on an asserted violation of his right to presence under Rule 3:16.
>
> [Ibid.]

Just as in Dellisanti, the jury in this case had only deliberated for a short period of time before defendant's medical issue arose. Moreover, just as the defendant's attorney in Dellisanti agreed to the procedures outlined by the court, here, defendant, acting as his own counsel, expressed his "agreement to the trial court's procedure and to the court's explanation to the jury." Ibid. Defendant's acquiescence is further evidenced by his "failure to request a delay of the trial . . . or to raise the issue of an 'involuntary' absence in a post-trial motion." Id. at 460.

46

Furthermore, whereas the defendant in <u>Dellisanti</u> was absent for the resolution of several substantive jury questions concerning evidentiary issues, here, no such questions were posed in defendant's absence. <u>Id.</u> at 450. In fact, defendant was an active participant in resolving the jury's requests for the audio recordings and related transcripts. Although the judge determined that the transcripts could not be provided to the jury because they were not admitted into evidence, the judge allowed the audio recordings of the phone calls to go into the jury room. The jury had no other questions regarding the evidence. Therefore, at the time he became absent, "defendant's ability to influence the course of events was complete." <u>A.R.</u>, 213 N.J. at 559. Under these circumstances, "the procedure utilized cannot be said to [have] undermine[d] the trial process" because it "simply did not implicate either defendant's right to confront evidence or witnesses against him or to assure a fair trial process." <u>Id.</u> at 558-59.

Defendant argues he was denied his constitutional right to counsel "when, after assuring him that . . . standby counsel would be present during all proceedings while [defendant] was absent, the trial court unilaterally replaced a juror during deliberations." By electing to represent himself, defendant waived his right to counsel. "[O]nce waived, the Sixth Amendment right to counsel is

no longer absolute." United States v. Leveto, 540 F.3d 200, 207 (3d Cir. 2008). Instead, "once the right has been properly waived, as is the case here, . . . the consideration of a defendant's post-waiver request for counsel is well within the discretion of the [trial] court." Ibid. We discern no abuse of discretion by the judge in the circumstances presented here.

In any event, the judge's decision to replace the juror is supported by the record and consistent with the principles governing such substitutions. It is well settled that "[appellate] review of a trial court's decision to remove and substitute a deliberating juror because of an 'inability to continue,' pursuant to Rule 1:8-2(d)(1), is deferential." State v. Terrell, 452 N.J. Super. 226, 271 (App. Div. 2016) (quoting State v. Musa, 222 N.J. 554, 564-65 (2015)). That said, "trial courts do not have unbridled discretion to reconstitute deliberating juries in the face of a jury crisis." State v. Hightower, 146 N.J. 239, 253 (1996).

However, Rule 1:8-2(d)(1) permits the substitution of a juror after the jury has begun its deliberations "if . . . a juror dies or is discharged by the court because of illness or other inability to continue." The rule is "intended to strike a balance between a defendant's right to a fair trial . . . and judicial economy." Musa, 222 N.J. at 565. To that end, before substituting a juror, a trial court must first "determine the cause of the juror's concern and assess the impact of the

juror's departure on the deliberative process." State v. Ross, 218 N.J. 130, 147 (2014). Then, "in light of the timing of the juror's dismissal and other relevant considerations, the trial court must ascertain whether a reconstituted jury will be in a position to conduct open-minded and fair deliberations." Ibid.

A trial court cannot replace a deliberating juror with an alternate "unless the record 'adequately establish[es] that the juror suffers from an inability to function that is personal and unrelated to the juror's interaction with the other jury members.'" State v. Jenkins, 182 N.J. 112, 124-25 (2004) (alteration in original) (quoting Hightower, 146 N.J. at 254). However, where those requirements are met and the record contains no "indicia that a reconstituted jury cannot engage in meaningful deliberations, our courts have consistently upheld the substitution of an alternate for a juror excused for personal reasons unrelated to the case." Ross, 218 N.J. at 147.

In considering whether deliberations have progressed too far to permit the substitution of an alternate, there is "[n]o bright line rule." Ross, 218 N.J. at 149 (quoting State v. Williams, 171 N.J. 151, 169 (2002)). The judge should instead engage in a fact-sensitive analysis, considering factors such as "the timing of the juror's departure, [the juror's] explanation of the problem prompting the inquiry, and communications from the jury that may indicate

whether deliberations have progressed to the point at which a reconstituted and properly charged jury will be unable to conduct open and mutual deliberations." Ibid.

If the court permits the substitution of an alternate for an excused juror, the court must "instruct the jury to recommence deliberations and . . . give the jury such other supplemental instructions as may be appropriate." R. 1:8-2(d)(1). At a minimum,

> [t]he trial court should charge the jury that the excused juror's departure was prompted by personal issues, rather than by [the juror's] view of the case or relationships with other jurors, that the reconstituted jury should not speculate on the reasons for the juror's departure, and that the jury should begin deliberations anew by setting aside their previous discussions so that the reconstituted jury may conduct full and complete deliberations.
>
> [Ross, 218 N.J. at 152.]

See also Model Jury Charges (Criminal), "Judge's Instructions When Alternate Juror Empaneled After Deliberations Have Begun" (rev. Mar. 14, 2016) (setting forth consistent instructions).

Here, before the jury returned to resume deliberations on December 16, the judge received a "communication" from juror 14, which the judge read into the record. The juror "informed the [c]ourt that he was identified as having close

contact" with two coworkers who "both tested positive for COVID" that morning. Although juror 14 had taken "a home test and tested negative," he had been "directed to self-quarantine by his employer" for ten days. In accordance with the parties' prior agreement that only the judge would be present when the jury returned to resume deliberations, neither the prosecutor nor standby counsel was present when the judge received and addressed the note.

Based on the note, the judge "f[ound] that the juror . . . [was] unable . . . to continue because of illness" as contemplated by Rule 1:8-2(d)(1) and required substitution. The judge also considered whether deliberations had progressed too far to permit the substitution, noting that the jury had only deliberated "for less than an hour" when deliberations halted while the parties considered the jury's request to hear the phone calls again. The judge explained:

> The deliberations certainly have not been going on for any length of time. This [c]ourt certainly does not find that the deliberations have proceeded so far towards completion that a reconstituted jury . . . would be . . . incapable of considering . . . defendant's guilt or innocence. Certainly[,] they can start anew based on the limited time that they had been deliberating. . . . I do find it is a permissible option to replace the juror. I will instruct [the jury] as [per] the model jury charge . . . to start their deliberations anew.

When the jury returned at approximately 1:30 p.m. on December 16, the judge apologized for the delay and instructed the jury "not to speculate" about

51

the cause of the delay.  Next, the judge issued the following instruction regarding

juror 14's absence:

> As you can see, [j]uror 14 is not present.  Juror 14 has been excused by the [c]ourt.  Juror 14 was excused from the jury [and] an alternate will be selected . . . to replace [j]uror 14.
>
> . . . .
>
> . . . The reason that [juror 14] has been excused was entirely personal to him, and has nothing to do with his views on the case or his relationship with the other members of [the] deliberating jury.  Please do not speculate as to the reason why the juror was excused.
>
> At this moment, you are a new jury and you must start your deliberations over again.  The parties have a right to have the verdict reached by [twelve] jurors who have had the full opportunity to deliberate from start to finish.  The alternate juror has no knowledge of the earlier deliberations.  Consequently, the new . . . deliberating jury must start over at the very beginning of the deliberations.  Each member of the original deliberating jury must set aside and disregard whatever may have occurred in anything which may have been said in the jury room following my instructions to you.
>
> You must give no weight to any opinion expressed by [j]uror 14 during deliberations before that juror was excused.  Together, as a new jury, you must consider all of the evidence presented at trial as part of your full and complete deliberations until you reach a verdict.

52

After addressing the jury's pending questions regarding the phone calls and transcripts in accordance with the parties' prior discussions on December 14 and 15, the judge instructed the jury "to start their deliberations anew." Although neither the prosecutor nor standby counsel was present during the judge's interactions with the jury in connection with the substitution of juror 14, both the prosecutor and standby counsel were present when the jury returned a verdict later that same day.

We discern no abuse of discretion in the judge's handling of and interactions with the jury. "A physical illness is recognized in the text of Rule 1:8-2(d)(1) to constitute a basis for removal and replacement of a juror." Ross, 218 N.J. at 147-48. "[A] juror suffering from a purely personal problem," such as COVID exposure, "c[an] be removed and replaced by an alternate without fear that the ultimate verdict's validity has been compromised." Jenkins, 182 N.J. at 130. Under the circumstances, it was not an abuse of discretion for the judge to opt for juror substitution, instead of declaring a mistrial. See Musa, 222 N.J. at 565 ("Declaring a mistrial imposes enormous costs on our judicial system . . . ." (quoting Jenkins, 182 N.J. at 124)). The record also shows that the judge thoroughly considered the status of the jury's deliberations to that point. Under the circumstances, there was nothing to suggest "that any juror had

reached a determination on a factual or legal issue," nor that "the jury was unable to engage in open-minded discussions after the substitution." Ross, 218 N.J. at 152.

In addition, after the jury returned, the judge issued the proper instruction regarding a juror's substitution. The judge's instruction mirrored the model jury instruction regarding the empaneling of an alternate juror after the beginning of deliberations. See Jenkins, 182 N.J. at 135 ("We find that the court did not err by instructing the jury consistent with the [m]odel [c]riminal [c]harge."); Model Jury Charges (Criminal), "Judge's Instructions When Alternate Juror Empaneled After Deliberations Have Begun." Thus, the judge's substitution of an alternate in place of juror 14 was entirely consistent with the procedures set forth in Rule 1:8-2(d)(1) and the governing case law.

Defendant contends that the judge erred because "defense counsel could have made arguments . . . about whether substitution was appropriate under the circumstances or whether alternatives[] such as a delay in deliberations would have been appropriate." We acknowledge that such decisions are better made in the presence of counsel. See State v. Morgan, 217 N.J. 1, 11 (2013) ("[J]udges must be especially careful about their own contacts with the jury and should not interact with jurors outside the presence of counsel."). However, failure to do

so "does not automatically require the reversal of defendant's convictions." State v. Brown, 275 N.J. Super. 329, 332 (App. Div. 1994). This is especially the case where, as here, the communication was preserved on the record, and "the record affirmatively discloses 'that the communication had no tendency to influence the verdict.'" Morgan, 217 N.J. at 12 (quoting State v. Auld, 2 N.J. 426, 432 (1949)).

Thus, although the better practice would have been to consult the parties before empaneling the alternate, the judge's failure to do so does not require reversal of defendant's convictions in the circumstances of this case. The judge read the entirety of juror 14's note into the record, thereby documenting the reason for the juror's absence. See ibid. ("[A]n adequate record of the contact may be able to dispel a presumption of prejudice."). Even if defendant had been able to oppose the substitution, "the death and illness standards are clear and narrow," and the precipitating event—juror 14's COVID exposure—clearly precluded him from further service. Hightower, 146 N.J. at 254. The record also shows that the judge did consider the possibility of delaying deliberations as an alternative to substitution but rejected it because of the time frame that had

been provided to the jury for the completion of the case.[7] See Musa, 222 N.J. at 571 ("A court is not required to postpone a trial for an indefinite period because a deliberating juror has not returned for service."). In the absence of any specific prejudice identified by defendant that resulted from the judge's failure to consult the parties beforehand, we discern no basis to intervene.

V.

In Point IV, defendant argues that the imposition of the maximum sentence based on "aggravating factors three, six, and nine" was "manifestly excessive." Defendant asserts the error "was compounded by running that sentence consecutive to the twenty-nine-year sentence [defendant] was already serving without an explicit statement as to the fairness of the overall sentence" in accordance with State v. Torres, 246 N.J. 246 (2021). Further, defendant contends the judge "failed to award the jail and gap[-]time credits [defendant] was due." Consequently, he urges us to vacate the sentence and remand for resentencing.

We review sentences "in accordance with a deferential standard," State v. Fuentes, 217 N.J. 57, 70 (2014), and are mindful that we "should not 'substitute

---

[7] The judge apparently told the jury that the trial would conclude before the "Christmas recess," which meant that it would conclude by Friday, December 23, 2021.

[our] judgment for those of our sentencing courts,'" State v. Cuff, 239 N.J. 321, 347 (2019) (quoting State v. Case, 220 N.J. 49, 65 (2014)).  Thus, we will

> affirm the sentence unless (1) the sentencing guidelines were violated; (2) the aggravating and mitigating factors found by the sentencing court were not based upon competent and credible evidence in the record; or (3) "the application of the guidelines to the facts of [the] case makes the sentence clearly unreasonable so as to shock the judicial conscience."
>
> [Fuentes, 217 N.J. at 70 (alteration in original) (quoting State v. Roth, 95 N.J. 334, 364-65 (1984)).]

In State v. Yarbough, 100 N.J. 627, 643-44 (1985), our Supreme Court set forth guidelines for evaluating the threshold question of whether to impose concurrent or consecutive sentences pursuant to N.J.S.A. 2C:44-5(a).  The Yarbough Court enumerated five specific facts sentencing courts should consider, including whether or not:

> (a) the crimes and their objectives were predominantly independent of each other;
>
> (b) the crimes involved separate acts of violence or threats of violence;
>
> (c) the crimes were committed at different times or separate places, rather than being committed so closely in time and place as to indicate a single period of aberrant behavior;
>
> (d) any of the crimes involved multiple victims;

(e) the convictions for which the sentences are to be imposed are numerous[.]

[Yarbough, 100 N.J. at 644.]

"The Yarbough factors serve much the same purpose that aggravating and mitigating factors do in guiding the court toward a sentence within the statutory range," State v. Abdullah, 184 N.J. 497, 514 (2005), and "should be applied qualitatively, not quantitatively," State v. Carey, 168 N.J. 413, 427 (2001); see also State v. Molina, 168 N.J. 436, 442 (2001) (affirming consecutive sentences although "the only factor that support[ed] consecutive sentences [was] the presence of multiple victims").

In Abdullah, the Court reminded trial judges "that when imposing either consecutive or concurrent sentences, '[t]he focus should be on the fairness of the overall sentence,' and that they should articulate the reasons for their decisions with specific reference to the Yarbough factors." 184 N.J. at 515 (alteration in original) (quoting State v. Miller, 108 N.J. 112, 122 (1987)). In Torres, the Court directed that when imposing lengthy consecutive sentences, "an explanation for the overall fairness of a sentence by the sentencing court is required" in order to curtail and, if necessary, correct "'arbitrary or irrational sentencing.'" 246 N.J. at 272 (quoting State v. Pierce, 188 N.J. 155, 166-67

(2006)).  Thus, consideration of the fairness of the overall sentence is "a necessary feature in any Yarbough analysis."  Cuff, 239 N.J. at 352.

Here, defendant was sentenced to an aggregate five-year term, with a two-year period of parole ineligibility, on counts one and three.  In imposing the sentence, the judge found aggravating factors three, six, and nine based on the high risk of re-offense, the extent of defendant's prior criminal record, and the need for deterrence, respectively.  See N.J.S.A. 2C:44-1(a)(3), (6), (9).  The judge found no mitigating factors and was "clearly convinced" that the aggravating factors "substantially outweigh[ed] the non[-existent] mitigating factors," justifying a maximum sentence for the offenses.[8]

We discern no abuse of discretion in the judge's decision, which is amply supported by credible evidence in the record.  We reject defendant's baseless argument that "the imposition of the maximum sentence based on those ubiquitous aggravating factors alone[] is manifestly excessive[,] warranting reversal."  See Fuentes, 217 N.J. at 73 ("[R]eason suggests that when the mitigating factors preponderate, sentences will tend toward the lower end of the range, and when the aggravating factors preponderate, sentences will tend

---

[8]  Defendant received a five-year sentence, with a two-year period of parole ineligibility, on count three, and a concurrent eighteen-month sentence on count one.

A-2708-21

toward the higher end of the range." (quoting State v. Natale, 184 N.J. 458, 488 (2005))).

Next, the judge addressed whether the sentence should be concurrent or consecutive to the sentence defendant was already serving on his 2015 conviction. Relying on Yarbough and its "progeny," the judge explained that consecutive sentences were appropriate because the offenses were nearly ten years apart and involved different victims and different locations. Additionally, according to the judge, the present offense evidenced "ongoing behavior . . . that [was] continual[ and] escalating."

Although the judge carefully explained why consecutive sentences were appropriate, he did not provide "an explanation for the overall fairness of [the] sentence" as mandated under Torres, 246 N.J. at 272-74. See also id. at 271 ("The mere identification of Yarbough factors as present when recounting the facts of defendant's offenses is no substitute for the required fairness assessment."). Consequently, we are constrained to order a limited remand "to allow the judge to provide '[a]n explicit statement, explaining the overall fairness' of the sentences imposed.'" State v. Amer, 471 N.J. Super. 331, 359 (App. Div. 2022) (alteration in original) (quoting Torres, 246 N.J. at 268), aff'd as modified on other grounds, 254 N.J. 405, 410 (2023). We stress that the

remand is limited to a <u>Torres</u> analysis, not a complete resentencing. Thus, "evidence of defendant's post-sentencing rehabilitation" is "outside the scope of th[is] remand order." <u>State v. Randolph</u>, 210 N.J. 330, 353 (2012).

Turning to defendant's argument that the judge erred in calculating his jail credit and gap-time credit, "<u>Rule</u> 3:21-8 provides that '[a] defendant shall receive credit on the term of a custodial sentence for any time served in custody in jail or in a state hospital between arrest and the imposition of sentence.'" <u>State v. Hernandez</u>, 208 N.J. 24, 36 (2011) (quoting <u>R.</u> 3:21-8(a)). "These credits for pre-sentence custody are referred to as 'jail credits.'" <u>State v. C.H.</u>, 228 N.J. 111, 117 (2017) (quoting <u>State v. Rawls</u>¸ 219 N.J. 185, 192 (2014)). "Jail credits are 'day-for-day credits' that are applied to the 'front end' of a defendant's sentence, meaning that [the defendant] is entitled to credit against the sentence for every day defendant was held in custody for that offense prior to sentencing." <u>Hernandez</u>, 208 N.J. at 37 (citation omitted) (first quoting <u>Buncie v. Dep't of Corr.</u>, 382 N.J. Super. 214, 217 (App. Div. 2005); and then quoting <u>Booker v. N.J. State Parole Bd.</u>, 136 N.J. 257, 260-63, 265 (1994)). "When the [rule] preconditions for the application of jail credits are satisfied, the award of such credits is mandatory, not discretionary." <u>Rawls</u>, 219 N.J. at 192-93 (quoting <u>Hernandez</u>, 208 N.J. at 37).

On the other hand, "[g]ap-time credit applies 'when a defendant, who has been sentenced previously to a term of imprisonment, is sentenced again for a different offense committed prior to the imposition of the earlier sentence." State v. Joe, 228 N.J. 125, 131 (2017) (quoting State v. Carreker, 172 N.J. 100, 103 (2002)). Such credits are awarded pursuant to N.J.S.A. 2C:44-5(b), which provides, in pertinent part:

> When a defendant who has previously been sentenced to imprisonment is subsequently sentenced to another term for an offense committed prior to the former sentence, other than an offense committed while in custody:
>
> . . . .
>
> (2) Whether the court determines that the terms shall run concurrently or consecutively, the defendant shall be credited with time served in imprisonment on the prior sentence in determining the permissible aggregate length of the term or terms remaining to be served[.]

Thus, after the first sentence is imposed, "a defendant is entitled to gap-time credits when sentenced on the other pending charges if '(1) the defendant has been sentenced previously to a term of imprisonment, (2) the defendant is sentenced subsequently to another term, and (3) both offenses occurred prior to the imposition of the first sentence.'" State v. Rippy, 431 N.J. Super. 338, 349 (App. Div. 2013) (quoting State v. Franklin, 175 N.J. 456, 462 (2003)). "If the

defendant meets those requirements, the sentencing court is obligated to award gap-time credits." Hernandez, 208 N.J. at 38. Additionally, "our courts have occasionally refrained from awarding gap-time credit in situations where there was little or no risk of manipulation by the prosecutor." State v. L.H., 206 N.J. 528, 532 (2011) (Long, J., concurring).

Here, the judge correctly concluded that defendant was only entitled to thirty days of jail credit for the period beginning November 18, 2015, the day he was charged with the instant offenses, and ending December 17, 2015, the day before he was sentenced on the aggravated sexual assault conviction. Defendant asserts he is "entitled to an additional [twenty-nine] days of jail credit," which equals the length of time he spent awaiting resentencing for the 2015 conviction. "'[O]nce the first sentence is imposed, a defendant awaiting imposition of another sentence accrues no more jail credit under Rule 3:21-8'" absent "the reversal of the convictions for which the first sentence was imposed." Rippy, 431 N.J. Super. at 349 (quoting Hernandez, 208 N.J. at 50). Although defendant's sentence for the 2015 conviction was vacated, his conviction was not. Pena, slip op. at 44. Therefore, defendant was not entitled to have that time credited towards this sentence. See also Rippy, 431 N.J. Super. at 350 ("[I]t is well-settled that a defendant who is serving a sentence on one

charge is not entitled to jail credits for that time served on another pending charge.").

Further, the judge's denial of gap-time credits was entirely proper. First, the present offenses were committed while defendant was in custody during the 2015 trial. Therefore, by the plain terms of N.J.S.A. 2C:44-5(b), the jury tampering convictions are not gap-time eligible. The judge also correctly denied gap-time credit on the ground that "there has been absolutely no manipulation by the State" in prosecuting the aggravated sexual assault charges before the tampering charges. See State v. Boykins, 447 N.J. Super. 213, 222 (App. Div. 2016) (noting that the risk for manipulation of sequence of trials was "minimal, if not non-existent" where subsequent offenses were committed two days before jury selection began in trial for earlier indictment). As the judge astutely observed, defendant committed the present offenses while the 2015 trial was ongoing, and there was "no way [the present offenses] could have been tried and sentenced before the . . . sentence . . . was imposed . . . on [the aggravated sexual assault conviction]." Thus, "the impossibility of prosecutorial manipulation" serves as a "separate rationale for denying gap-time credits" in this case. L.H., 206 N.J. at 528 (Long, J., concurring).

A-2708-21

In sum, we affirm defendant's convictions and remand for the limited purpose of "allow[ing] the judge to provide '[a]n explicit statement, explaining the overall fairness' of the sentences imposed" consistent with Torres. Amer, 471 N.J. Super. at 359 (second alteration in original) (quoting Torres, 246 N.J. at 268). To the extent we have not addressed any specific arguments, it is because they lack sufficient merit to warrant discussion. R. 2:11-3(e)(2).

Affirmed as to defendant's convictions and remanded for further sentencing proceedings consistent with this opinion. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-2708-21